Thomas v. Gavin.

doubtedly have covered such point by the terms of the statute.

Mr. Justice Parker concurs in the above.

———

[No. 1316, August 30, 1910.]

C. E. THOMAS, Appellant, v. G. E. GAVIN, Appellee..

SYLLABUS (BY THE COURT.)

1. An agreement not to engage in the business of buying and selling lumber in a certain town or its vicinity for two years in consideration of the purchase at stipulated prices of the entire stock of lumber of the seller then on hand in the business in which the seller is then engaged in the lumber business, is not void as being in restraint of trade.

2. While a single sale of lumber would not in itself amount to engaging in the lumber business, it would be evidence on the question whether the seller was engaging in that business and in connection with other circumstances might furnish sufficient proof that he was so engaged.

3. In an agreement for the sale of a stock in trade and that the seller for a time abstain from engaging in the business in which it was employed, there was a provision that a sum named should be considered liquidated damages in case of a breach of the agreement by either party to it. Held, that it was for the court to determine from the circumstances of the case whether the sum named should be considered a penalty or liquidated damages. And the trial court having found actual damages only instead of the stipulated sum, for a breach of such a contract, it was at liberty, in addition to its judgment for damages, to enjoin the defendant from further violating the agreement in question.

Appeal from the District Court for Chaves County before W. H. POPE, Chief Justice. Affirmed.

R. D. BOWERS for Appellant.

Contract was void because it was in restraint of trade. 2 Beach Cont., art. 175.; Moore v. Bennett, 140 Ill. 69, 15 L. R. A. 364, 29 N. E. 891.

The proper measure of damages is the loss to plaintiff. Gregory v. Speiker, 110 Cal. 150, 42 Pac. 576; Peltz v. Eichele, 62 Mo. 171, 180; Lashus v. Chamberlain, 5 Utah 140, 13 Pac. 361; Howard v. Taylor, 90 Ala. 241, 8 So. 36; Warfield v. Booth, 33 Md. 63; 2 Sedgw. Dam. 632.

Reid & Hervey and J. M. O'Brien for Appellee.

The finding of fact is binding being based upon substantial evidence. Hancock v. Beasley, 14 N. M. 239, 91 Pac. 735.

The good will of a business is not the business but is one result springing out of it. McGowan v. Griffin, et al.. Vt., 37 Atl. 298.

Measure of damages. Peltz, et al, v. Eichele, 62 Mo. 170, 180; Gregory v. Speiker, 110 Cal. 150, 42 Pac. 576, 52 Am. St. Rep. 70, 74; Larkins v. Chamberlain, 5 Utah 140, 13 Pac. 361; Graham v. Plate, 40 Cal. 493; El Modello Cigar Co. v. Gato, 25 Fla. 886, 23 Am. St. Rep. 537; Avery v. Meikle, 85 Ky. 435, 7 Am. St. Rep. 604.

So long as the purchaser of good will continues in that business and the stipulation of the vendor not to engage in such business remains in force, the vendor cannot enter into competition with him either in his own account or as the agent or business manager of another. 20 Cyc. 1280; Meyers v. Laban, 51 La. Ann. 1726, 26 So. 463; Garvin v. Hawkins, 42 N. Y. Suppl. 603; Jefferson v. Market, 112 Ga. 498, 37 S. E. 758; Ewing v. Johnson, 34 Howard Pr., N. Y., 202, 205; Kramer v. Old, 119 N. Carolina 1, 25 S. E. 815, 56 Am. St. Rep. 650; 34 L. R. A. 389; Vonderbank v. Schmidt, 44 La. Ann. 264, 32 Am. St. Rep. 336.

## STATEMENT OF THE CASE.

This is a suit in which the plaintiff, here the appellee, seeks to recover damages from the defendant, here the appellant, for the alleged breach of a written contract which

was entered into between them on May 5, 1909, which contract contained the words:

"That, whereas the party of the first part (appellant) is the owner of a certain lot of lumber and building material and is engaged in the business of buying and selling such merchandise, but for reasons sufficient to himself, is desirous of closing out all of the said material and discontinuing the business, and the party of the second part is willing to purchase the same provided the first party will not again engage in such business in the city of Roswell, or vicinity for a period of two years from this date. * * * * * *

"Now, therefore, in consideration of the above and foregoing the party of the first part agrees to sell and the party of the second part agrees to buy," etc.

At the trial, which was by the district judge without a jury, it appeared that the defendant had sold to one Brooks a carload of lumber which, however, was ordered by him before May 5, 1909, but arrived and was delivered after that date, and had taken an order for a carload for one Levers after that date which for some reason he did not accept and for which the defendant found another customer. That the lumber was ordered from a mill located at St. Augustine, Florida, in which his brother was part owner and there was evidence to the effect that he derived profit from each transaction; that he claimed the right to take and fill similar orders in the future provided that he did not have a lumber yard and buy and sell lumber at it, as he had done before the agreement with Gavin, and that he meant to take and fill such orders as he had opportunity.

It also appeared that the stock purchased by the plaintiff, amounted to $1,103.77 at the agreed price and that the plaintiff removed the same from the place where the defendant had been doing business and did not continue the business there. That the defendant expected to derive a profit from said transaction and to continue making like transactions, claiming that he had the right to take and forward orders for lumber to be delivered on the

cars if he did not have an established place of business and buy and sell lumber at it.

### OPINION OF THE COURT.

ABBOTT, J.—The attorneys for the appellant claim that the provision of the contract in question that he should not engage in the business of buying and selling lumber in Roswell or the vicinity for a period of two years is void for being in restraint of trade. They attach significance to the fact that by the terms of the contract neither the business itself nor the good will of it was sold, but a quantity of lumber only. It is well settled both at the common law and under the anti-trust act that an agreement to refrain from engaging in a certain business within reasonable limits of time and place is valid if it is made as subsidiary to the main purpose of disposing of property employed in that business on better terms than could be obtained without such an agreement. To bring the transaction within that rule it is not necessary that the "good will" of the business should be in terms included in the sale. The seller might have obtained a stock of goods for the purpose of going into business, and have no business or "good will" to sell and through some change of circumstances be desirous of selling his stock of goods. It would be unreasonable to hold that he is forbidden in the public interest to better his chance of making a sale by including in it and disposing of his right to engage in the proposed business in that place for a reasonable length of time. Wood v. Whitehead Bros. Co., 165 N. Y. 545, 551; United States v. Freight Assn., 166 U. S. 293, 329; Hopkins v. United States, 171 U. S. 578, 600; Field v. Barber Asphalt Paving Co., 194 U. S. 618, 23.

The appellant denies, further, that he did engage in the business of buying and selling lumber in Roswell or the vicinity after the execution of the contract in question, contrary to its terms.

There was evidence that ordering lumber by the carload for customers to be delivered without the expense of passing it through the lumber yard was an important feature of the lumber business in Roswell and that the

appellant was to some extent doing business in that way at the time of his sale to the plaintiff since at least one car load of lumber he had so ordered arrived and was delivered after May 5, 1909, the date of his agreement with the plaintiff. The clear purpose of the agreement was to prevent the defendant from competing with the plaintiff in the lumber business in Roswell and vicinity, in any manner, and to that he should be held. Meyers v. Laban, 51 La. Ann. 1726; 26 So. Rep. 463; Jefferson v. Markert, 112 Ga. 498.

It is true, as the defendant contends, that a single transaction does not generally speaking constitute "engaging in business." Nelson v. Johnson, 38 Minn. 255. But while the trial judge in his opinion filed in the cause refers to the order of the carload of lumber for Levers as being the breach of the defendant's contract on which the judgment was based, yet there were other circumstances which in his view must have given character to the transaction. To order a carload of lumber would not be a matter of daily or even frequent occurrence in a small business such as that of the defendant's obviously was. There would not, therefore, be many transactions of the kind in a limited length of time. There was evidence of only two from about the middle of April to some time in July. That evidence, coupled with the evidence that the defendant said he had the right notwithstanding his contract, to take orders for car load lots and meant to do it as often as he had the chance, warranted the trial court in finding that he was engaged in the lumber business. Abel v. State, 90 Ala. 631-3.

It is true the defendant denied that he made the statement referred to, but the trial judge must have believed that he did since he made the injunction which had been prayed for against his engaging in business, permanent. The findings of the trial judge without a jury on questions of fact will ordinarily not be set aside by this court when there is substantial evidence to sustain them. Candelaria v. Miera, 13 N. M. 360 and cases cited.

The agreement between the plaintiff and defendant provided explicitly for the sum of $1,000 as liquidated

damages in case either party should violate its terms. But "when the stated sum obviously and grossly exceeds any just measure of compensation" it is generally recognized that the court which has to pass on the question can treat it as a penalty and award actual damages. Sutherland on Damages, Sec. 295, quoting at length from Perkins v. Lyman, 9 Mass. 522. See also 13 Cyc. 99, and cases cited, especially Smith v. Brown, 164 Mass. 584, and cases cited.

In this case the lumber which the plaintiff agreed to buy of the defendant amounted, at the stipulated prices per thousand, to only $1,134.77. On a strict construction of their agreement for liquidated damages, the plaintiff would have had to pay the defendant $1,000 if he had refused to take the lumber, that is he would have had to pay practically its full value, and the defendant would still have had the lumber, which would have been little less than a *reductio ad absurdum*. And when, as it happened, the District Court found that the defendant had violated the agreement to the extent, so far as the evidence went, of the sale of a single car load of lumber only, it would have been manifestly against justice to fix the damages at $1,000, and we think, on the ground stated, the court was justified in awarding only what it found to be actual damages. Besides, the award of the full sum of $1,000 would, by the weight of authority, have left the defendant free from his obligation not to engage in business and Sutherland, sec. 298, declares that plaintiff in such a case may have his choice between the liquidated damages agreed upon and an injunction against engaging in business, but cannot have both.

As the contract between the parties is entire, no action for damages would lie for any further breach of it. Some of the authorities go so far as to hold that even in such a case there can not be an injunction as well as a recovery of damages. We see no good reason, however, so to hold. In case of payment of the full amount of stipulated damages or judgment therefor, it may well be considered that the party liable for a breach of the agreement has suffered what was provided in case of such a breach as an alternative to keeping his agreement and is thus left free. But if instead,

as in this case, judgment is rendered for only actual damages, before the expiration of the time of abstention from engaging in business agreed upon, the courts, we think, are warranted in protecting the injured party for the remainder of that time by injunction.

The defendant avers that the District Court made the defendant's supposed profit instead of the plaintiff's loss by the sale of the car load of lumber in question, the measure of damages. It is true that in his opinion filed in the cause the trial judge may seem to intimate that such was the case, but a decision which is well founded in fact will not be disturbed because some of the actual grounds, and perhaps the strongest grounds for it, are not stated. Lockhart v. Wills, 9 N. M. 344, 359, citing Wisne v. Brown, 122 U. S. 214.

Evidence of the profit made by the defendant was admissible as bearing on the question of the plaintiff's loss. But to that point there was also the evidence that the man for whom the car load of lumber was ordered was a customer of the plaintiff to whom he might naturally have sold any lumber he required and that the defendant claimed and was exercising the right to take orders for car load lots of lumber and so was in competition with the plaintiff, thereby, of necessity in a comparatively small town, affecting his business injuriously.

The amount of damages awarded was justified by the evidence. The judgment of the District Court is affirmed.

[No. 1328, August 30, 1910.]

YOUNG & NORTON, et al., Appellants, v. M. C. HINDERLIDER, Appellee.

SYLLABUS.

1. The power of the territorial engineer to reject an application "if in his opinion the approval thereof would be contrary to the public interest," is not limited to cases in which the project would be a menace to the public health or safety.

Young & Norton et al. v. Hinderlider.

2. The mere fact that irrigation under the former project would cost more per acre than under the latter is not conclusive that the former project should be rejected.

3. Cause remanded to obtain facts through the water commissioners and territorial engineer, or by agreement of counsel, or otherwise, essential to a satisfactory decision of the cause.

Appeal from the District Court for San Juan County before JOHN R. McFIE, Associate Justice. Remanded to obtain further facts essential to satisfactory decision.

MARTIN & EDWARDS for Appellants.

The territorial engineer is the only proper authority to pass upon the practicability, public utility and general effectiveness of any proposed system of irrigation in this territory. Pueblo of Nambe v. Romero, 10 N. M. 58, 61; Newcombe v. White, 5 N. M. 435; Bull v. Southwick, 2 N. M. 321; McCarville v. Boyle, 89 Wis. 651; Howell v. Mills, 53 N. Y. 322; Mills v. Davis, 53 N. Y. 349; Appeal of Vaux, 109 Pa. St. 497.

The two elements of a valid appropriation of water are (a) diversion and (b) beneficial application to some useful purpose. There can be no private ownership of water of the public streams of this Territory. Land & Irr. Co. v. Gutierrez, 10 N. M. 177-240; New Mercer Ditch Co. v. Armstrong, 21 Colo. 357, 366; Combs v. Agricultural Ditch Co., 17 Colo. 146, 150.

E. C. ABBOTT and H. C. ALLEN for Appellee.

Priority in time shall give the better right. Laws 1907, p. 73, sec. 2.

Manner of determining reasonableness of rate for water delivered for irrigation. Wilterding v. Green, 4 Ida. 773, 45 Pac. 134; Boise City Irr. & L. Co. v. Clark et al, Co. Com., Ida., 121 Fed. 415; Slosser v. Salt River C. Co., 7 Ariz. 376, 65 Pac. 332; Gould v. Maricopa C. Co., Ariz., 376, 65 Pac. 598; Salt River Val. C. Co. v. Nelssen, Ariz., 85 Pac. 117.

## STATEMENT OF THE CASE.

On the first day of October, 1907, M. C. Hinderlider filed with the territorial engineer an application for a permit to appropriate 200 second feet of the flow of the La Plata river in San Juan County, New Mexico, and for the construction of a storage reservoir with a storage capacity of 12,406 acre feet for the purpose of reclaiming an irrigating about 14,000 acres of land in said county.

On December 20, 1907, Messrs. Young & Norton for themselves and others filed with the territorial engineer an application for a permit to appropriate the waters of the same stream in the same county and Territory, for the purpose of reclaiming and irrigating about 5,000 acres of land, being a part of the same land covered by the Hinderlider project. This last application included the construction of a storage reservoir with a storage capacity of 10,149 acre feet for the purpose of storing the flood waters of said river and applying the same to the reclamation of the said 5,000 acres of land.

After the publication of the notice required by law and on the 19th day of March, 1908, the said Young, Norton and others filed with the territorial engineer a protest against the approval of the said Hinderlider application.

That after a hearing before the territorial engineer and on July 20, 1908, he rendered an opinion sustaining said protest rejecting the Hinderlider application and approving the application of the protestants, the said findings and order of the said territorial engineer, omitting the caption, being in words and figures as follows:

The territorial engineer finds, from the evidence presented by oral testimony, at the hearing in the above matter, at Aztec, on the 10th day of April, 1908, from affidavits presented before and after said hearing, and from the official records:

First. That M. C. Hinderlider on the first day of October, 1907, filed with the territorial engineer an application for a permit to appropriate an amount equal to two hundred second feet of continuous flow during irrigation season, of public water from the La Plata river, for the purpose of irrigating 14,000 acres.

Second. That the survey necessary before making said application was made prior to the opening of the land for settlement, and that the application was asked for the purpose of appropriating said water by the forming of a company, the building of necessary construction works and the sale of water rights at a cost of $40 per acre on land under said project and that a large portion of said land is under the control of protestants who have entered or settled on the land.

Third. That on March 19, 1908, Young, Norton and twenty-two others filed protests against the granting of said application of M. C. Hinderlider and also against the granting of an application by Jay Turley and others.

Fourth. That the protestants Young and Norton and others, filed application for a permit to appropriate public waters from the same stream on the 20th day of December, 1907, with the intention of irrigating 5,000 acres.

Fifth. That Young and Norton et al., are actual settlers or entrymen on about 5,500 acres under the project, and that the above parties immediately after October 3, 1907, when the said lands were opened to entry by the U. S. government, employed surveyors to make surveys preparatory to making an application for a permit to appropriate, and that they used reasonable diligence in collecting data in the shape of maps and surveys, for the filing of said application at an early date.

Sixth. That the application of Young and Norton was not asked for speculative purposes, but with the intent of irrigating and developing the lands now settled or entered upon by said settlers.

Seventh. That the cost of their works can be built by Young and Norton, et al., for less than $20 an acre.

Eighth. That on the 25th day of October, 1907, Jay Turley and H. L. Hollister filed an application for a permit to appropriate water from said La Plata river to irrigate the lands owned by Young and Norton et al., and the engineer ordered of them a statement of their intended prices per water right for land under control by protestants, but statement of said prices was not filed in the office of the territorial engineer, but that he was informed verbally

that they would ask $35 an acre for water right upon said land, and

Ninth. That the extent of the unappropriated flood waters available is not sufficient to irrigate more than five or six thousand acres.

Therefore, the engineer is of the opinion:

First. That there is unappropriated water available for approximately five or six thousand acres.

Second. That either the applicant or protestants, if their applications were approved, could and would complete their appropriation satisfactory to the Territory.

Third. That the Young and Norton et al., project is more within the available water supply, making same more feasible.

Fourth. That it would not be to the best interests of the public to approve the application of M. C. Hinderlider, thereby forcing the protestants to pay more than double price for their water rights. The same conditions as to the public interest would also apply to the application of Jay Turley et al., in so far as the amount of water allowed in the approval of Young and Norton et al., application might be affected.

It is therefore ordered, that the application of Young and Norton be approved, as follows:

APPROVAL OF TERRITORIAL ENGINEER.

The number of this permit is 107.

Date of receipt of first application, December 20, 1907.

Publication of notice completed and proof filed March 23, 1908.

Application recorded in Book A, page 107.

Approved this twentieth day of July, 1908.

This is to certify that I have examined the within application for a permit to appropriate the public waters of the Territory of New Mexico, and hereby approve the same.

The amount of water appropriated:

(a) By diversion.............cubic feet per second.

(b) By storage, 20,290 acre feet.

(c) Remarks: This application is limited to an annual appropriation of 20,290 acre feet and shall not be

exercised at such times that the same would be of detriment of prior valid rights to the use of water from said stream.

The construction of the within described works to be commenced not later than Jan. 1, 1909.

One-fifth of the work above specified to. be completed on or before July 20, 1909.

The whole of said work to be completed on or before July 20, 1910.

The time for application to beneficial use shall not be later than October 1, 1911.

Witness my hand this 20th day of July, 1908.

(Signed) VERNON L. SULLIVAN,
Territorial Engineer.

In the event of the failure of Young & Norton et al, to complete their appropriation according to the above approval, the applications of M. C. Hinderlider and Turley and others will be considered in routine of their priority of filing.

. . . . . . . . . . . . . . . . . . . . . . .
Santa Fe, New Mexico, July 20, 1908.

Thereupon the said Hinderlider appealed from the decision of the said territorial engineer to the Board of Water Commissioners of this Territory, which board after hearing all of the evidence offered by the parties and the argument of counsel, reversed the decision of the said engineer and directed him to approve the application of the said Hinderlider, the findings and order of said board being in words and figures as follows, to-wit:

STATEMENT.

It appears from the records in the office of the territorial engineer and from the applications, maps, plats, field notes and affidavits and other papers filed in the office of the territorial engineer and with the board, and from the testimony presented to the board at the several hearings: That on the first day of October, 1907, M. C. Hinderlider, filed with the territorial engineer an application for a permit to appropriate water from the La Plata river in San Juan County, New Mexico, to an amount equal to

two hundred second feet continuous flow during the irrigation season, for the purpose of irrigating 14,000 acres of land and for the construction of a storage reservoir with a capacity of 12,406 acre feet at one filing and the ditches and reservoirs necessary to carry out said project. That after publication of notice, a protest was filed by appellees Young and Norton et al, on March 19, 1908; and after a hearing on April 10, 1908, the territorial engineer sustained the protest and rejected the application of M. C. Hinderlider, at the same time approving the application for practically the same water, filed by John D. Young and Geo. N. Norton, two of the protestants, which application was filed in the office of the territorial engineer on December 20, 1907, and contemplated irrigating about 5,000 acres of land.

From this decision M. C. Hinderlider appealed to the board. The reasons alleged by the protestants for the rejection of Mr. Hinderlider's application were, that the protestants were actual settlers or entrymen on some of the land proposed to be watered; that the application of Mr. Hinderlider was not based upon actual surveys, measurements and field notes made by him, but upon surveys made by the United States Reclamation Service at the expense of the United States, and which he was not entitled to use for his personal benefit; and that the project contemplated by the application of Hinderlider was considerably more expensive than that contemplated by the application of Messrs. Young and Norton, and the rejection of the Hinderlider application and the approval of that of Young and Norton might enable the owners of the land in that neighorhood to obtain water rights at less cost.

In rejecting the application of Hinderlider and approving that of Young and Norton, the territorial engineer gives as his chief reason for his decision that the project of Young and Norton is more within the available water supply and therefore a more feasible project, and that it would not be to the best interests of the public to approve the application of Hinderlider, thereby forcing the protestants to pay a larger price for their water rights than they might have to pay under the project of Young and Norton.

At the hearing before the board, at Farmington, in San Juan County, and the subsequent hearing in Santa Fe, it was shown to the satisfaction of the board that the survey from which the maps, plats and field notes filed by Hinderlider were made, was an actual survey made under his direction, and at his expense by an engineer and assistants employed by him. It appears that the engineer, employed by Hinderlider, did retrace a ditch line previously surveyed by the United States Reclamation Service, using the government stakes whenever convenient, or wherever they were in place, but the testimony of the engineer and his assistant and the original field book kept by him in which the notes of his survey were recorded, showed conclusively that he did make an actual survey and that the plats, maps, and field notes filed by Hinderlider were taken from these notes. It was shown by the evidence, that Hinderlider and also the engineer employed by him to make this survey, had been in the employ of the U. S. Reclamation Service in making surveys in that neighborhood for an irrigation project which had been abandoned by the government, and the knowledge so obtained and the stakes of the abandoned government ditch line were undoubtedly of great assistance to them in making the subsequent survey; but it appears that they did not use the field notes of the government survey in any manner in preparing the application, maps, plats and field notes filed with the territorial engineer.

The engineer in his decision, based his action on the ground that the project of Young and Norton would be for the best interest of the public because it would enable people living in that vicinity and under the proposed ditch to purchase water at a less price than they might have to pay were the application of Hinderlider approved.

DECISION.

The board is of the opinion that the statute, section 28, chapter 49, laws of 1907, contemplates that the territorial engineer may reject an application if he finds that the project would be contrary to the public interest, in that it would be a menace to the public health or safety,

and not for the reason that a project described in an application subsequently filed might be more advantageous to the owners of private property in the neighborhood; and that it was not the intention of the legislature to vest in the territorial engineer or the board such discretionary powers as to authorize him or them to discriminate against a prior application in favor of one filed later, because one project would be less expensive than another to water users. The same principle should govern with respect to applications to appropriate water under the New Mexico statute as in the applications for entries of lands under the public land laws of the United States; the first application making a filing in compliance with the law should be recognized, and if he shall subsequently comply with the regulations and statutes, his application should be approved, unless the project is, in the opinion of the engineer, a menace to the public health or safety, or unless there is no water available under the application.

In the present case the testimony shows that there is unappropriated flood water available and that while it is claimed that the project of Young & Norton might be more advantageous to the protestants, nevertheless, the project described in the prior application is feasible and its approval would not be contrary to the public interest. The board believes that the interest of the owners of the land under the proposed ditches and reservoir who may desire to become water users under the project are amply protected by the provisions of law which require owners of such works to supply water at reasonable rates.

The board could take into consideration the question of benefits to the public from the construction of the respective projects, it would be manifestly more to the benefit of the public, being the people of the Territory of New Mexico, or the people of San Juan County, New Mexico, to have the larger project constructed which would furnish water to irrigate 14,000 acres, than a smaller one to cover only about 5,000 acres; and it would be exceedingly detrimental to the interests of all the people of the Territory if a bona fide application by one who had complied with all the requirements of the statute and the rules and regu-

lations established by the territorial engineer, were to be rejected upon such grounds in favor of an application subsequently filed. It is certainly to the interests of the Territory that outside capital be invited and encouraged to construct irrigation works in the Territory and that the law relating to water rights be consistently enforced so as to protect those who in good faith initiate such enterprises.

For the foregoing reasons the decision of the territorial engineer in rejecting the application of M. C. Hinderlider, and in approving the subsequent application of Young & Norton in so far as the same includes any rights covered by the prior application, is hereby reversed, and the territorial engineer is directed to approve the said application of M. C. Hinderlider.

(Signed) CHARLES SPRINGER,
President, Board of Water Commissioners.

The protestants, Young, Norton and others appealed from the decision of the water commissioners to the District Court of San Juan County in which the cause was heard Nov. 17, 1909, on an agreed statement of facts, which is in words and figures as follows:

"1. On the 1st day of October, 1907, M. C. Hinderlider filed with the territorial engineer an application for a permit to appropriate 200 second feet of the flow of the La Plata river, in San Juan County, New Mexico, and for the construction of a storage reservoir with a storage capacity of 12,406 acre feet, all for the purpose of reclaiming and irrigating about 14,000 acres of land in said county and Territory.

"2. On December 20, 1907, these protestants filed with the territorial engineer an application for a permit to appropriate the waters of the same stream in the same county and Territory for the purpose of reclaiming and irrigating about 5,000 acres of land, being a part of the same lands covered by the Hinderlider project. The said application included the construction of a storage reservoir with a storage capacity of 10,149.3 acre feet, for the purpose of holding and storing the flood waters of said La Plata river and applying same to the reclamation of said 5,000 acres of land.

"3.   That on March 19, 1908, these protestants filed with the territorial engineer a protest against the approval of the said Hinderlider application, alleging among other things that the protestants are all actual settlers or entrymen upon the land proposed to be watered, aggregating 5,000 acres; that protestants believe that they can conduct water to their land at an approximate expense of $11 an acre, and that protestants are financially able to immediately proceed with the construction of the proposed ditch and reservoir; that if their application be allowed they will at once proceed with the construction of the said ditch and reservoir and will have their lands under water for the season of 1909; that they could not positively state what the water would cost per acre for their use on their lands, if they must purchase it from Mr. Hinderlider, but that they were credibly informed and believed that the cost of the same would be from $30 to $40 per acre; that the application of the said Hinderlider was made for speculative purposes and for the personal benefit of the applicant, while the application of protestants was made for the benefit of actual settlers upon the land.

"4.   That after a hearing, the territorial engineer, on July 20, 1908, rendered an opinion sustaining said project rejecting the Hinderlider application, and approving the application of protestants, findings as per copy of said decision herein filed.

"5.   That thereupon the said M. C. Hinderlider, appealed from the decision of said territorial engineer to the board of water commissioners of this Territory, which board, after hearing the evidence, and argument of counsel, reversed the decision of the said engineer, findings as per copy of their decision herein filed.

"6.   That the said M. C. Hinderlider is financially able to immediately proceed with the construction of the said ditch and reservoir.

"7.   From said decision of said board these protestants have taken this appeal to this court.

That court sustained and affirmed the decision of the board of water commissioners, to which action Young,

Norton and others excepted and brought the matter to this court on appeal.

## OPINION OF THE COURT.

ABBOTT, A. J.—We think the decision of the District Court was justified and probably required by the statement of facts on which it was heard, but we find that statement very incomplete and unsatisfactory as the basis of a decision in such a cause. If it were a matter of private interest alone, a question simply between two rival applicants for the right to use the waters in question, we should content ourselves with affirming the decision of the District Court. But the question is much broader than that, and includes the public interest as well, by the terms of the statute under which the territorial engineer, the water commissioners and the courts have jurisdiction of the subject matter.

The view apparently adopted by the water commissioners in their decision that the power of the territorial engineer to reject an application, "if in his opinion the approval thereof would be contrary to the public interest," sec. 29, is limited to cases in which the project would be a menace to the public health or safety is, we think, not broad enough.

**1**

There is no such limitation expressed in terms in the statute and we think not by implication. The declaration in the first section of the statute that the waters therein described are "public waters" and the fact that the entire statute is designed to secure the greatest possible benefit from them for the public, should be borne in mind.

It is, for instance, obviously for the public interest that investors should be protected against making worthless investments in New Mexico, and especially that they should not be led to make them through official approval of unsound enterprises. If there is available, unappropriated water of the La Plata river for only five or six thousand acres of land, it would be contrary to the public interest that a project for irrigating fourteen thousand acres with that water should receive an official approval which would, perhaps, enable the promoters of it to market their scheme.

to sell stock reasonably sure to become worthless, and land which could not be irrigated, at the price of irrigated land. Such a proceeding would in the end result only in warning capital away from the Territory. The failure of any irrigation project carries with it not only disastrous consequences to its owners and to the farmers who are depending on it, but besides tends to destroy faith in irrigation enterprises generally.

It may be said that the territorial engineer could have approved the Hinderlider project for the number of acres which could be irrigated from it. He makes it clear, however, from his report, that the cost of the works for that project would be much greater than for works fit to irrigate the land which could really be irrigated from the available water there.

While that element is not conclusive on the question of public interest, we think it should be taken into account. It may be that, of the five or six thousand acres there which it is claimed can be irrigated at an expense of ten or twelve dollars per acre under the Young-Norton project, a thousand acres could be irrigated at five dollars per acre because of its being at a lower level or nearer the water than the other land. But that would not justify refusing to the owners of the other four or five thousand acres the privilege of irrigating their lands, under a plan which would increase the cost of irrigation to the owners of the thousand acres. And the same may be said of the Hinderlider project as compared with the Young-Norton project. The mere fact that irrigation under the former project would cost more per acre than under the latter is not conclusive that the former project should be rejected.

But the attempt to cover too much land may have gone so far that the cost of irrigation under that project would be so excessive that the owners of land under the project could not pay the water rates and farm their lands at a profit. The statute provides that the charges for irrigation shall be "reasonable" but what is reasonable in any case must depend largely on the cost of constructing and operating the irrigating works.

The agreed statement of facts on which the judgment of the District Court is based may be held to include by reference the findings of the territorial engineer and those of the board of water commissioners although it is not made clear that they are to be a part of the stipulated facts, as it should be if that was the intention of the parties. Even if they are to be considered we are still without proper material for a conclusion. The territorial engineer finds that the Young, Norton project is "better within the available water supply," but that furnished no reason why he should not have approved the earlier project for the amount of land there is water for. He does not find that the cost of water under the Hinderlider project would be prohibitory or excessive but only' that it would be considerable greater per acre than under the Young-Norton project. The price which the owners of land can afford to pay for irrigation must depend in part on the use to which it can be put.

For ordinary farm crops forty dollars per acre for water might be prohibitory, while for fruit or garden truck in certain localities it might not be excessive. But neither the territorial engineer nor the water commissioners have touched on that point in their reports. The territorial engineer apparently bases his approval of the latter project as against the former on the fact that Young and Norton and their associates are actual settlers on the land while Hinderlider is not a resident of the territory. We do not say this circumstance should have no weight in determining the question of the public interest, but we think it should not outweigh the other considerations to which we have referred.

On the other hand, the water commissioners find that there is available unappropriated flood water of the La Plata river but do not find whether there is enough for fourteen thousand or any other number of acres, nor whether the cost of the Hinderlider project would be such as necessarily to make the irrigation charges under it prohibitory or excessive.

We find in Armijo v. County Commissioners, 11 N. M.

Davisson v. Bank & Owens.

294, a precedent for the course which we think it advisable to pursue in this matter.

The cause is therefore remanded to the District Court to obtain facts through the water commissioners and territorial engineer, or by agreement of counsel or otherwise essential to a satisfactory decision of the cause.

It is not meant to limit the District Court to the precise points we have named, but to leave the matter open for the introduction of any facts bearing on the question of public interest. And the judgment of the District Court is set aside in order that it may on further consideration render such decision as it shall deem proper.

---

[No. 1332, August 30, 1910.]

GEORGE A. DAVISSON, Plaintiff, Appellant, v. CITIZENS' NATIONAL BANK OF ROSWELL, N. M., Defendant, Appellee, and ETTA OWENS, Defendant, Appellant.

### (SYLLABUS BY THE COURT.)

1. Under the circumstances set out in the statement of facts, the appellee as holder of an escrow was not justified in delivering it to either party.

Appeal from the District Court for Chaves County before W. H. POPE, Chief Justice. Reversed and remanded.

ED. S. GIBBANY and W. A. DUNN for Appellants.

Where a person responsible either by operation of law or express contract, to another has notice of a suit against the latter, and an opportunity to appear and defend, the judgment rendered in the action will be conclusive on him whether he appeared or not. 23 Cyc. 1270; Nathan v. Rehkopf, 57 Ill. App. 212; Robbins v. City of Chicago, 4 Wall. 657; American Bell Telephone Co. v. National Imp. Telephone Co., 27 Fed. 663; Doty v. Hawkins, 25 Amer.

Davisson v. Bank &·Owens.

Dec. 459; Wells v. American Express Co., Wis., 42 Am. Rep. 695; McAnally v. Chapman, 18 Tex. 198; Dushy v. Rudder, 80 Mo. 400; Bushnell v. Chautauqua Co., Nat. Bk. 74 N. Y. 290.

It is gross negligence of the bank, which is bailee of bonds by special deposit for which a receipt or certificate has been given, to deliver or dispose of them without direct authority from the depositor. Manhattan Bank v. Walker, 32 U. S. 959, 130 U. S. 267; Nathan v. Rehkopf, 57 Ill. App. 212; Preston v. Prather, 137 U. S. 604; Briggs v. Spaulding, 141 U. S. 150, 35 L. ed. 670; First National Bank v. First National Bank, 116 Ala. 532; Merchants National Bank v. Guilmarten, 17 L. R. A. 324; Merchants National Bank v. Carhart, 52 L. R. A. 776; Gray v. Merriam, 32 L. R. A. 772.

Fraud and misrepresentation. 9 Pl. & Pr. 681, 703; Geer v. Boston Little Circle Zinc Co., 103 S. W. 157; Roth Tool Co. v. Champ Spring Co., 67 S. W. 967; 9 Enc. P. & P. 681, 703; 14 A. & E. Enc. Law, 2 ed., 156; Crane v. Reeder, 25 Mich. 303; Comstock v. Ames, 3 Keys, N. Y., 357; Marvin v. Schilling, 12 Mich. 356; Depuy v. Williams, 26 Cal. 309; Warburton v. Aken, 1 McLean, U. S., 460; St. Louis, etc., R. Co. v. Clark, 121 Mo. 169; Book v. Justice Min. Co., 58 Fed. Rep. 106; League v. Davis, 53 Tex. 9; International, etc., R. Co. v. Searight, 8 Tex. Civ. App. 593; Chicago Dock Co. v. Kinzie, 49 Ill. 289; Best v. Davis, 44 Ill. App. 624; Morrison v. Collier, 79 Ind. 417; Dixon v. Duke, 85 Ind. 434; Townsend v. Vanderverter, 40 U. S. 383; Union Pacific R. R. Co. v. McAlin, 32 U. S. 637, vol. 3 L. R. A. N. S. 790 and annotations.

If the purchaser fails to comply with the terms of sale, or if the sale is not completed through his fault, then the deposit becomes forfeited to the vendor and cannot be re-·covered back. Nathan v. Rehkopf, 52 Ill. App. 212; Warvelle Vendors, secs. 926, 927; Hansborough v. Peck, 5 Wall. 497; Galway v. Shields, 66 Mo. 313; Bradford v. Parkhurst, 96 Calif. 102; Day v. Wilson, 83 Ind. 463; Downey v. Briggs, 102 Iowa 88; Cobb v. Hale, 29 Va. 510.

Agents' commission. Hildebrand v. Lillis, 51 Pac. 1008; Gilder v. Davis, 20 L. R. A., N. S. 398.

Where the language of a written escrow agreement is uncertain and ambiguous, it is the duty of the court, in construing it, to take into consideration the circumstances and conditions existing when it was made, in order to ascertain the intention of the parties. Clarke v. Eureka County Bank, 123 Fed. 922, and authorities cited; case affirmed, 130 Fed. 325.

Even where time is declared to be of the essence of the contract, it may be waived by the conduct of the party for whose benefit the stipulation is made. 9 Cyc. 608; 16 Cyc. 578; Brown v. Guarantee Trust, etc., Co., 128 U. S. 453; Phillips, etc., Const. Co. v. Seymour, 91 U. S. 646; Amoskeag Mfg. Co. v. U. S., 17 Wall. 592; McAlpine v. Reicheneker, Kans., 42 Pac. 339; Kent v. Church of St. Michael, N. Y., 18 L. R. A. 331; Welch v. Dutton, 79 Ill. 465.

One who pays earnest money on a contract for the sale of lands, cannot recover the same until he shows that he is willing to consummate the bargain made. Brockhausen v. Bowes, 50 Ill. App. 98; Hansborough v. Peck, 5 Wall. 497; Glock v. H. & W. Colony Co., Cal., 43 L. R. A. 199, 55 Pac. 713; Johnson v. Puget Mill Co., Wash., 68 Pac. 867; 23 Am. Dig., Century Ed., Col. 2350 and cases cited.

The fact that parties have made a written agreement, by no means precludes them from contracting anew with regard to the same subject matter. Goss v. Lord Nugent, 27 E. C. L. 37; Kirchner v. Laughlin, 4 N. M. 394, 17 Pac. 132, 23 Am. Dig., Col. 2350.

If a depository, bailee or holder of an escrow negligently pays over or delivers a fund in its possession to the wrong person, it is guilty of conversion and answerable therefor. 3 A. & E. Enc. of Law, 2nd ed., 762; 9 A. & E. Enc. of Law, 2nd ed., 291, 292; Southern Railway Co. v. Atlanta Nat. Bank, 112 Fed. 861; Clark v. Eureka County Bank, 123 Fed. 922; Kahaley v. Haley, Wash., 47 Pac. 23.

Assignment of check in escrow. 8 Wait's Act and Def. 116, 118; Christmas v. Russell, 14 Wall. 84; Central Nat. Bank v. Spratlin, Colo., 43 Pac. 1048.

Parties to suit. 15 Enc. P. & P. 731, 738; 2 A. & E. Enc. of Law, 2d. ed., 1092; 4 Cyc. 83, 84.

Commissions. Lunney v. Healey, 44 L. R. A. 593, 616; Gilder v. Davis, 20 L. R. A. 398; Brackenridge v. Claridge, 43 L. R. A. 600, 601.

REID & HERVEY for Appellee.

Findings of fact supported by any substantial evidence will not be disturbed on appeal. Richardson v. Pierce, 14 N. M. 334, 93 Pac. 715; Eagle Mining Company v. Hamilton, 14 N. M. 271, 94 Pac. 949; Hancock v. Beasley, 14 N. M. 239, 91 Pac. 735; Candelaria v. Miera, 13 N. M. 360, 84 Pac. 1020; Ortiz v. Bank, 12 N. M. 519, 78 Pac. 527; Marquez v. Land Grant Co., 12 N. M. 445, 78 Pac. 40 ; Carpenter v. Lindauer, 12 N. M. 388, 78 Pac. 57; Rush v. Fletcher, 11 N. M. 555, 70 Pac. 559; Romero v. Coleman, 11 N. M. 553, 70 Pac. 559; Gale & Farr v. Salis, 9 N. M. 211, 66 Pac. 520.

Definition of escrow. 16 Cyc. 561.

Depositor must have power to judge whether conditions have been performed. 16 Cyc. 576, 584; Humphrey v. Richmond, etc., Ry. Co., 13 S. E. 985; Henderson v. Johnson, Colo., 22 Pac. 463; Burlington R. R. Co. v. Palmer, 42 Ia. 222; Bodwell v. Webster, 113 Pick. 411; Hayden v. Meeks, Ark., 14 S. W. 864; Equity Gaslight Co. v. McKeige, 34 N. E. 898, N. Y.; Humphrey v. Richmond & M. R. Co., 13 S. E. 985; Riggs v. Trees, Ind., 5 L. R. A. 696.

Notice and judgment. Black on Judgments, 2 ed., sec. 574.

## STATEMENTS OF FACTS.

The appellant Owens and one Berryman entered into a contract for the sale of lands, the appellant Davisson acting as agent for Owens. The conditions of the contract are not material here. After signing up the contract, Berryman drew his check upon an Arkansas bank in favor of Davisson, as agent, for $9,173.32, the check was placed in an envelope with the contract of sale and the parties in company went to the appellee bank and delivered the envelope containing the check and contract to the cashier of

the bank, who, as the court found, in the presence and with the concurrence of all the parties; made the following written endorsement on the envelope:

"Check enclosed to be held in escrow until September 10th, when final settlement is to be made, deed and abstract to be placed in escrow with this. Abstract to be forwarded to the Citizens Bank and Trust Company, Arkadelphia, Ark., for examination. No money to be paid over until abstract is approved. (Signed) J. J. Jaffa, Cashier."

Berryman thereafter made demand upon the bank for the return of the money, the check in the meantime having been cashed and the money in the hands of the bank. The bank called upon the appellants for their consent, which, for various reasons, they refused to give, but the bank delivered the money to Berryman. Suit was brought by Davisson against the bank to recover his commission on the sale. Mrs. Owens and her co-executors of the estate of Solon M. Owens, deceased, were made parties defendants. They answered and filed a cross-complaint against the bank and asked judgment for the money. The case was tried by the court without a jury. Judgment for the appellee and appellants bring this appeal.

### OPINION OF THE COURT.

MECHEM, J.—The court below held that the bank's liability was fixed and limited by the memorandum above mentioned, and that as no abstract "approved by purchaser's attorney" was presented to the bank on or prior to September 10th, that after said date "it became the duty of the bank to deliver the said check or its proceeds to C. C. Berryman, one of the parties to the escrow agreement upon demand."

Now, it is admitted that the bank was acting as agent for both parties as far as the escrow itself was concerned, and the question is, did the bank act as it should have acted, or did it fail in its duty to either party?

Admitting the correctness of this holding for the sake of argument, the question then is, did the bank fulfill its duty to the appellants as fixed by the memorandum? To

Davisson v. Bank & Owens.

this question we think the reply should be in the negative, for the reason that nowhere in the memorandum was the bank authorized to make any delivery of any paper, money or anything.

Had the appellants both agreed that Mr. Berryman should have his money or check back, then the bank would have been relieved from any liability, but it owed just as much duty to the appellants as it did to Berryman, and should not have taken sides, and when it failed to secure appellant's consent, it should have held the escrow and let the parties either come to some agreement among themselves or appeal to the courts, when the appellee could have interpleaded the money into court and secured its acquittance.

However, it took sides in this matter and will be held as it should be, to have acted at its peril and to be responsible to appellants for the fund if they can show a right to the same under the contract made with Berryman, either in its original form or as amended by the parties to it.

The law governing the duties of the bank in this case is well stated by Page in his work on contracts.

"The depository of an escrow is regarded as an agent of both obligor and obligee, and he can neither return the deed or other instrument to the former without the latter's consent, nor save upon the fulfilment of the agreed conditions deliver it to the latter without the former's consent." 2 Page Contracts 585.

There happened no condition, as set forth in the memorandum, upon the fulfillment of which, or failure to fulfill, the bank was directed to return the papers to either party.

We do not deem it necessary upon this appeal to decide any of the other questions raised by the brief of appellants, except that the appellees will be held to be responsible to the appellant if they, upon a re-trial of this cause, shall sustain a right to the money the bank had belonging to Berryman and paid over to him in violation of its duty to appellants.

The judgment of the lower court is reversed and remanded with instructions to reinstate the cause and proceed in accordance with the views expressed in this opinion.

[No. 1245, August 31, 1910.]

## DELOS A. CHAPPELL, Appellant, v. DANIEL H. Mc-MILLAN, et al, Appellees.

### SYLLABUS (BY THE COURT.)

1. A promise to do or forbear from doing an act may be just as valuable consideration for a promise as the act or forbearance would be, and that the promise given for a promise is dependent on a condition does not affect its validity as consideration.

2. If promises are made in the alternative and one alternative promise becomes impossible of performance, that does not impair the obligation of the other promise.

3. The holding of the trial court that the contract between the Carthage Coal Company, one of the appellees, and Delos A. Chappell, the appellant, had become null and void from failure of consideration, that both parties were wholly released therefrom, and its action in decreeing the cancellation of said contract, were not warranted as a matter of law under the circumstances appearing in the case.

Appeal from the District Court for Socorro County before FRANK W. PARKER, Associate Justice. Remanded for further proceedings.

YEAMAN & GOVE and H. M. DOUGHERTY for Appellant.

Until delivery of the escrow holder or the happening of the event upon which delivery is conditioned, the instrument is ineffectual for any purpose. 16 Cyc. and cases cited; Stiles v. Brown, 16 Vt. 563; Stanley v. Valentine, 79 Ill. 544; Parrott v. Parrott, 1 Heisk 681; Henry v. Carlson, 90 Ind. 412; Skinner v. Baker, 79 Ill. 496; Morgan v. Carter, 48 Minn. 501.

The court will not set aside an instrument originally valid but which has since become ineffectual by reason of subsequent events, destroying its future operations upon the ground that it creates a cloud upon the title to real

Chappell v. McMillan et al.

estate. Hotchkiss v. Elling, 36 Barbour 36; Warvelle on Abstracts 550; Fonda v. Sage, 48 N. Y. 173; Lehman et al. v. Roberts, 86 N. Y. 232.

A counter claim is a demand existing in favor of the defendants against the plaintiff and which might have been prosecuted if plaintiff had never sued at all. Pomeroy Code Pl., sec. 614; Anderson, etc., v. Thompson, 88 Ind. 405; Graham v. Dunnegan, 6 Duer. 629; 6 Cyc. 292; Grand Chute v. Winega, 15 Wal. 373.

If the promise is in the alternative to do one of two things, and one becomes impossible, this does not excuse the doing of the other. 7 A. & E. Enc. 2 ed., 149; Jacquinet v. Boutron, 19 La. Ann. 30; Barkworth v. Young, 4 Drew 1; DeCosta v. Davis, 1 B. & P. 242; Mill Dam Foundry v. Hovey, 21 Pick., Mass. 417, 443; Pindor v. Upsters, 44 N. H. 358; 11 Century Digest, sec. 346; Rose v. San Antonio Ry., 31 Tex. 49; 9 Cyc. 327; Gray v. Bowen, 23 N. Y. Sup. 67; Patton v. Mills, 21 Kans. 163; Mueller v. Spring, 88 Mich. 390; Nolen v. Pine, 40 Iowa 166; Collins v. Gibbs, 2 Burrow 899; Locks v. Wright, 1 Strange 569; Clark v. Great Northern Ry. Co., 81 Fed. 282.

JAMES G. FITCH for Appellee.

Causes of action which are inconsistent with each other, cannot as a general rule be joined. 23 Cyc. 404, 405 B, 406 and cases cited; Bliss on Code Pleading, sec. 122; Phillips on Code Pleading, sec. 199; Polock v. Shafer, 46 Cal. 270; Golucke v. Lowndes Co., 123 Ga. 412, 51 S. E. 406; Vaule v. Steenerson, 63 Minn. 110, 66 N. W. 257; Boyd v. St. Louis Transit Co., 108 Mo. App. 303, 83 S. W. 287; Scherer v. Tyrrell, 40 Hun. 637; Budd v. Bingham, 18 Barb. 494; McLennan v. Prentice, 85 Wis. 427, 55 N. W. 764; Bowen v. Mandeville, 95 N. Y. 237; Gardner v. Ogden, 22 N. Y. 327; Taylor Co. v. Pumphrey, 32 S. W. 225, Tex. Civ. App.

After the time within which an amendment is permitted as a matter of course, plaintiff cannot either before or after the evidence has been taken, substitute a new cause of action under the cause of an amendment. Simpson v.

Miller, 94 Pac. 252, Cal. Civ. App.; Cassidy v. Saline Bank, 104 S. W. 829, Ind. Ter.; Foste v. Life Insurance Co., 26 Or. 449, 38 Pac. 617; Gleason v. Gleason, 54 Cal. 135; Buchanan v. Comstock, 57 Barb. 582; Prouty v. Lake Shore R. R., 85 N. Y. 272; Jacob v. Lorenz, 98 Cal. 332, 33 Pac. 119; Riley v. St. Louis R. Co., 124 Mo. App. 278, 101 S. W. 156; Woodward v. N. P. Ry., 16 N. D. 38, 111 N. W. 627; Red Diamond Cloth. Co. v. Steidemann, 120 Mo. App. 519, 97 S. W. 220; Herman v. Glann, 129 Mo. 325, 31 S. W. 589; Purdy v. Pfaff, 104 Mo. App. 331, 78 S. W. 824; Ross v. Cleveland Land Co., 162 Mo. 317, 62 S. W. 984; Swedish-Am. Nat. Bank v. Dickinson, 6 N. D. 222, 69 N. W. 455; Allen v. City of Davenport, 115 Iowa 20, 87 N. W. 743; Meyer v. Berlandi, 39 Minn. 438, 40 N. W. 513; Bliss on Code Pleading, sec. 396; Phillips on Code Pleading, sec. 273.

Plaintiff did not stand on his demurrer to the counter claim, but after it was overruled filed a reply. He thereby abandoned it. Beall v. Territory, 1 N. M. 507; Overland Dispatch Co. v. Wedeles, 1 N. M. 528; Bremen Min. Co. v. Bremen, 13 N. M. 111; 7·Cyc. 256; Phillips on Code Pleading, secs. 306, 307; Bliss on Code Pleading, sec. 417.

In suits for rescission or cancellation all persons whose rights, interests, or relations with or through the subject matter of the suit would be affected by the cancellation or rescission should be brought before the court, so that they can be heard in their own behalf. 6 Cyc. 319; 16 Cyc. 106; Bowman v. Germy, 23 Kan. 306; Valentine v. Fish, 45 Ill. 462; Troxel v. Thomas, 155 Ind. 519, 58 N. E. 725; Pomeroy Code Remedies, secs. 90, 97; Bliss on Code Pleading, secs. 348, 351a, 411; DePuy v. Strong, 37 N. Y. 372; Grain v. Aldrich, 38 Cal. 514.

The facts warranted the finding of the court, that the lease was void, and the decree of cancellation. 9 Cyc. 320, 326, 369, 615; Philpot v. Gruninger, 14 Wall. 520, 20 L. 743; Dermott v. Jones, 23 How. 220, 16 L. 442; Cadwell v. Blake, 6 Gray, Mass., 403; Beacher v. Conradt, 13 N. Y. 108; Smith v. Wilson, 8 East 437; Boone v. Eyre, 1 Henry Blackstone 273; 9 Cyc. 615; Locke v. Wright, 1 Strange 569; Collins v. Gibbs, 2 Burrows 899; Clark v. Great

Northern Ry., 81 Fed. 282; Harvester King Co. v. Mitchell, 89 Fed. 173; 1 Parsons on Contracts, 3 ed., 386; Allen v. Hammond, 11 Pet. 63, 9 L. 633; Stewart v. Louring, 87 Mass. 306; Hoffman v. Duryea, 77 N. Y. Sup. 1086; Savage v. Whitaker, 15 Me. 14; Dickinson v. Hall, 31 Mass. 217; 6 A. & E. Enc. 787, Note 2.

## STATEMENT OF THE CASE.

On February 2, 1904, the Carthage Coal Company gave to Daniel H. McMillan an option to purchase certain land and personal property at any time prior to May 15, 1904. This option was thereafter extended, in accordance with its terms, to August 15, 1904. The purchase price, seventy-five thousand dollars, was to be paid in installments. Upon the payment of the first installment, title was to pass to McMillan, but possession was to be retained by the coal company until the payment of the second installment at or before the specified time, when McMillan was to be given possession. On July 1, 1904, the Carthage Coal Company entered into an agreement with the plaintiff, the appellant, Chappell, which was expressly made subordinate to the rights of McMillan under his option. The instrument evidencing this agreement provides that Chappell should have the right to purchase the property if McMillan should not, and a deed was placed in escrow for delivery to Chappell in the event of the exercise of his option; that Chappell should have a lease on the premises from August 16, 1904, until all coal should be extracted therefrom, or McMillan should be entitled to the premises under his option, Chappell obligating himself to work the property and pay a specified royalty for all coal extracted; and that in the event McMillan should take up his option and pay the full purchase price for the premises, thus depriving Chappell of all right to obtain the property as lessee or purchaser, the coal company should pay to him, from the funds realized from the last installment of the McMillan option, the sum of ten thousand dollars. On July 23, 1904, and within the time limited for his second payment, McMillan elected to exercise his option to purchase, and on that date made both the first and the

second payments required to the coal company and received a deed conveying title to the property, and through his grantees took immediate possession. On the 25th day of July, 1904, the plaintiff filed a bill, which was afterwards amended, in which he attacked the validity of the McMillan option and all conveyances thereunder, for want of consideration and for fraud, and asked for their cancellation, and an injunction to prevent the defendants from mining coa; under them, and to restrain them from preventing the plaintiff from mining coal, under his said agreement, and thereafter the defendants, the Carthage Coal Co., August H. Hilton and Henry R. Buel filed an answer and counter claim to the amended complaint, and in the counter claim asked for the cancellation of the deed in escrow under Chappell's option, and the entire contract of July 1, 1904, in effect alleging the same to be a cloud on their title and claiming failure, or want of consideration for the contract of July 1, 1904. To this counter claim the plaintiff filed a general demurrer, which was overruled by the court. Thereafter, on the 25th day of September, 1904, plaintiff filed an answer to the counter claim, specifically pleading the lease and option of July 1, 1904, and, in substance, claiming to be entitled to the payment therein provided for in case McMillan should purchase under his option, of ten thousand dollars. To this answer three of the defendants, on November 13, 1907, filed a demurrer and the court sustained the demurrer on December 30, 1907. On the 2nd day of June, 1908, the court entered an order in said cause affirming the validity of the McMillan option and the conveyances made under it, and decreeing the cancellation of the agreement with the plaintiff of July 1, 1904, and the escrow deed connected therewith.

### OPINION OF THE COURT.

ABBOTT, J.—The appellant does not here call in question that part of the order of the District Court of June 2, 1908, which decrees the validity of the McMillan option and the related conveyances. The essential injury of which he complains to this court, through his assignments of error, is that by the order referred to, his agree-

ment with the Carthage Coal Company, of July 1, 1904, was declared void and its cancellation decreed. Of the appellees only the Carthage Coal Company, August H. Hilton, and Henry R. Buel are parties to the pleadings on which that portion of the order is founded. In their briefs, both parties claim that the question of the validity of the Chappell agreement with the Carthage Coal Company was not before the trial court on the pleadings. That position, we think, is untenable for the appellant since he chose not to stand on his demurrer to the counter claim of the appellees above named, whereby they alleged the invalidity of the agreement in question, and prayed for its cancellation, but instead replied to the counter claim, alleging the validity of his agreement and his right to the payment of ten thousand dollars from the Carthage Coal Company, in accordance with its terms. Overland Dis. Co. v. Wedeles and cases cited, 1 N. M., 528, 531; Bremen Mining Co. v. Bremen, 13 N. M. 111. On the other hand, the three appellees named aver that the appellant, having in his original complaint alleged the invalidity of the McMillan option, is precluded from afterwards, in the same cause, making any claim based on its validity. Whether the appellant is chargeable with fatal inconsistency in his pleadings we need not determine, since the appellees did not make that one of the grounds of their demurrer to his reply to their counter claim, but alleged and relied on the invalidity of the Chappell agreement, for failure of consideration moving from the appellant to the Carthage Coal Company.

The trial court sustained the demurrer, and must therefore have passed on the validity of the Chappell agreement, arriving apparently at the conclusion embodied in Finding of Law 3, which is as follows: "The contract and lease between the Carthage Coal Company was made subject to the rights of the said McMillan under his said option with the Carthage Coal Company and by the election to purchase and the making of the first and second payments of the purchase price, the conveyance of the Carthage Coal Company to the said McMillan and by him to the said Stackhouse and the taking of possession by the

latter, before any payment had been made or any act had been done, or was required to be made or done under or by virtue of the terms of the contract and lease between the Carthage Coal Company and the plaintiff, discharged and released both said plaintiff and said company from all their promises and undertakings therein contained, and the said contract and lease became null and void and there resulted an entire failure of consideration therefor."

Fortunately, the attorneys in the cause did not, on either side, stand on the position that the validity of the Chappell agreement was not involved, but, instead, have aided the court with able and exhaustive arguments on the question, in their briefs. Adopting the facts as stated in the finding of the trial court quoted, it is obvious that we must first determine what was the consideration on Chappell's part for what the Carthage Coal Company in its contract with him of July 1, 1904, agreed to do. Was it that he actually should mine certain quantities of coal and pay to the Carthage Coal Company certain royalties thereon, etc., or that he should promise and agree to do those things in certain contingencies, binding himself to the defendant coal company, to that effect by a valid agreement? On this the whole matter turns. It is familiar law (Cyc. 9, 323) that a promise to do or forbear from doing an act may be "just as valuable consideration for a promise as the act or forbearance would be," and "that the promise given for a promise, is dependent on a condition does not affect its validity as consideration." Cyc. 9, 327.

It was plainly in the minds of the parties, as the contract shows, that Chappell might never make a payment, never mine any coal, never pay any royalties; yet he might have had to do all those things under his contract in the event that McMillan did not buy under his option. The unavoidable inference from the terms of the Chappell agreement and the other facts of record is that, for some reason, the coal company thought or feared that McMillan would not buy under his option, or that the outcome would somehow be unsatisfactory to it. It clearly preferred disposing of the property in question, at a less price and on

more favorable terms to the purchaser than it had made to McMillan, to holding and operating it. It gave Chappell an option to buy it for $65,000, whereas the price to McMillan was $75,000. The difference of $10,000 between the two prices is significant as being the very amount which it agreed to pay Chappell in case McMillan should take the property under his option. In effect, it agreed to give the benefit of the McMillan option to Chappell, as to the first payment to be made under it, which, if made, was to relieve Chappell to that extent, and in the difference of $10,000, between the two prices, in consideration of his agreeing to take the mine off its hands, operate it and pay a royalty in the event of the expected failure of McMillan to buy under his option. Up to the time when McMillan met the terms of his agreement, it was protected against such a failure by the Chappell agreement for a consideration which was clearly expressed, and on terms which must have been in the minds of the parties since they were explicitly embodied in the contract.

The appellees contend that the "object" or "motive" of the coal company in making the Chappell agreement is to be distinguished from the "consideration" on Chappell's part, which is true, but the obvious motive or object throws light on what was the real consideration. The appellees claim also that the appellant attempts to read into the Chappell agreement conditions which it does not contain when he asserts "that his promise to mine coal and pay a royalty was in the alternative, or that it was dependent upon the validity and exercise of McMillan's option." Yet such, we think, is the plain import of the language of the agreement. After the provisions in it which are appropriate to and constitute a lease of the property, it provides thus: "It is further provided that this lease and option is subject to the rights, if any he has, of Daniel H. McMillan growing out of an option given by the said party of the first part to the said McMillan on the 2nd day of February, A. D., 1904, and the said party of the second part agrees to protect and save harmless the said party of the first part from any litigation which might be brought by the said McMillan against the said party of the first

part by reason of his having executed this contract." And: "It is further agreed that if it should be determined that the said Daniel H. McMillan has the right to carry out the said option that all payments, except the first, which has hereinbefore been provided for, shall be paid to said party of the first part herein, except ten thousand dollars of the last payment specified in the said option, which shall be made to the party of the second part herein, and in case of the refusal or neglect of the said Daniel H. McMillan to pay the same to the party of the second part, that the party of the first part shall make such payment to party of the second part." The "rights" referred to, included the right as "determined" by the district court to do the very thing which McMillan did, namely, to make the two first payments provided for by his option and take possession of the property in question before August 16th, 1904, at which date the appellant would have been entitled to take possession but for that action of McMillan. Even if McMillan had made the first payment under his option, but not the second, before August 16, 1904, the appellant, Chappell, would have been bound to take possession of the mine and operate it, since the agreement provided that in such case "the lease and contract shall be in full force and effect." That is, if it should be determined that McMillan had the right to do a certain thing and he did it before a certain time, the appellant was not bound to take possession, mine coal, etc., otherwise he was so bound. Suppose McMillan had made the first payment required of him but not the second before August 16, 1904, that the appellant had taken possession, mined coal, etc., as his contract required, and that McMillan had in a few weeks or days thereafter, by making the second payment provided for in his option, become entitled to possession and ousted the appellant. As we understand the position of the appellees they would concede that in such a case the appellant would have been entitled to the ten thousand dollars he claims. We certainly see no reason to the contrary. But he was bound by his contract to do that, if McMillan should take that course, and necessarily to hold himself in readiness to do it, until it should become known whether McMillan

would or would not take that course. That was an onerous obligation, one which would prevent a man unless he was possessed of much more than ordinary means, from engaging in other business enterprises while it continued in force. Unless he gets the ten thousand dollars he claims under his contract he has no compensation for the burden he thus assumed, by which he became practically the insurer of the coal company against the failure of McMillan to buy under his option. Suppose one should obtain a policy of insurance against accident for a term of a year and agree to pay the premium at the end of the year. The year expires and he has met with no accident. When asked to pay for the policy of insurance, he says: "The policy was for my benefit in case of accident to me, and it is now impossible that any accident should occur to me in that year. The consideration for my agreement to pay has failed; become impossible of performance on the part of the maker of the policy, since it was to pay me nothing unless in case of accident in that year." The reply would be, that the company which issued the policy had done all it agreed to do, obligated itself to pay the policy holder a certain amount in case he should meet with an accident, and that it incurred the risk of having to make such a payment.

When the appellant assumed the obligations expressed in his agreement with the Carthage Coal Company he furnished a valuable consideration for the concurrent promises of the coal company to him. That those promises were in the alternative, and one alternative became impossible of performance does not impair the obligation of the alternative promise. Vol. 7, Am. & Eng. Enc. (2nd. ed.) p. 149; Mill Dam Foundry v. Hovey, 21 Pick., Mass., 417-443; See also Pinder v. Upster, 44 N. H. 358.

Other points are discussed by counsel in their respective briefs, but we do not find that they were before the trial court; at least, in a way to affect its action.

We are, therefore, of the opinion that the demurrer of the three appellees named to the appellant's reply to their

counter claim should have been overruled. It may be, of course, that these appellees have a good defense against the claim which the appellant makes for the payment of $10,000 to him, under the agreement in question, and they should not be deprived of the opportunity to make such a defense, if they have one.

The case is remanded to the District Court for further proceedings in accordance with this opinion, between the appellant and the three appellees, the Carthage Coal Company, August H. Hilton and Henry R. Buel.

William H. Pope, C. J., John R. McFie, A. J., and Edward R. Wright, A. J., concur.

M. C. Mechem, A. J., dissents.

F. W. Parker, A. J., heard case below.

---

[No. 1250, August 31, 1910.]

## EAGLE MINING & IMPROVEMENT COMPANY, Plaintiff in Error, v. ROBERT E. LUND, Defendant in Error.

### SYLLABUS (BY THE COURT.)

1. Where the plaintiff in error files a transcript of the record, but not, as required by Sec. 20, Chapter 57 of the Laws of 1907, ten days before the return day of the writ, and also files assignments of error, but not before the return day of such writ, a motion to dismiss the writ of error, on those grounds, not made until after such filing, will be denied. Armijo v. Abeytia, 5 N. M. 533.

2. A decree granting an injunction and appointing a receiver for an insolvent corporation under the provisions of Sections 72 and 73 of Chapter 79, of the Laws of 1907, is a final decree within the terms of the Organic Act relating to appeals and writs of error.

3. A decree appointing a receiver to take possession of all and every the estate, real, personal and mixed of an insolvent corporation with power to collect and take possession of all the properties and assets of the corporation

and to make an inventory of the same and to abide the further orders of the court with relation thereto considered by itself, there having been no injunction previously granted by the court as provided in Section 72 of Chapter 79 of the Laws of 1905, is properly classified as an interlocutory order or decree and not subject to appeal or writ of error.

Error to District Court for Chaves County before WILLIAM H. POPE, Chief Justice. Writ dismissed.

G. W. PRICHARD for Plaintiff in Error.

The suit should have been brought in the judicial district in which the property lies. C. L. 1897, secs. 882, 2950, par. 4; Laws 1905, chap. 79, sec. 75; A. & E. Enc. of Law, 2 ed., 65; Booth v. Clark, 17 How. U. S. 335; Holmes v. Sherwood, 16 Fed. 727, and cases cited; Smith on Receiverships 56, 122 and cases cited.

The facts and circumstances must be set out in the complaint from which the insolvency of the company shall appear. Newfoundland R. R. Construction Co. v. Shack, 40 N. J. Eq. 222, 226; Rawnsley v. Trenton Life Ins. Co., 1 Stock. 95; Cook v. East Trenton Pottery Co., 54 New Jersey Equity 29; Pierce v. Old Dominion Copper Co., 65; Atlantic Rep. 1005.

Insolvency is an absolutely essential ingredient of fact in every case in which the court is asked to enjoin a corporation and to appoint a receiver to take charge of the assets. Atlantic Trust Co. v. Consolidated Storage Co., Dick. Ch. Rep. 402; Edison et al, v. Edison United States Phonograph Co., 7 Dick Ch. Rep. 620; Newfoundland R. R. Con. Co. v. Shack, 40 N. J. Eq. 222; Ft. Wayne Eln. Com. v. Franklin Eln. L. Co., 57 N. J. Eq. 7.

The order appointing a receiver should describe the property which the receiver is to take. Smith on Receivers 63 and cases cited; Hellebush v. Blake, 119 Ind. 350; O. Mahoney v. Belmont, 62 N. Y. 133; Crow v. Wood, B. Beaver 273.

R. E. LUND for Defendant in Error.

The court having undisputed jurisdiction of the defendant, it may not only proceed as to the person, making such orders and decrees as it deems equitable as to him or it, but it may also deal with, and exercise jurisdiction over and concerning the acts, the res or rem of such defendant, even though these be wholly beyond the court's jurisdiction, in another state. Lyon v. Crosby, 27 Pac. 786; 14 Pac. 775; "Equity," 16 Cyc. 118, 119; 5 N. M. 297; Phelps v. McDonald et al, 99 U. S., 25 L. ed., 473, syl. 3; Laws 1905, chap. 79; 22 Cyc. 785, 906, note and citations.

When a person is unable to pay his debts, he is an insolvent. Cunningham v. Norton, 125 U. S. 77, 31 L. ed., 624; Toof et als, v. Martin, 80 U. S. 40, 51, 20 L. ed., 481; 2 Burrill's Law Dic., 2 Enc. P. & P. 3, Insolvency; 22 Cyc. 1256.

It is an established principle of Equity, that when a corporation becomes insolvent, *it is so far civilly dead,* that its property may be administered as a trust fund for the benefit of its stockholders and creditors. Blake v. McClung, 172 U. S. 254, 43 L. ed. 437; Laws 1905, 79, art. 7; Mullins v. Moline M. I. Co., 131 U. S. 352, 33 L. ed. 178; 172 U. S. 254 and cases cited; 114 U. S. 587, 594; 150 U. S. 371, 385.

## STATEMENT OF FACTS.

This is an action brought by the defendant in error in the District Court of Chaves County under the provisions of Sections 72 and 73 of Chapter 79 of the Laws of 1905, for an injunction restraining the plaintiff in error, a mining corporation organized under the laws of New Mexico, with its principal office and all of its property within the County of Lincoln, from continuing to exercise its corporate powers and franchises and appointing a receiver to take charge of and administer the properties and effects of the plaintiff in error. Objections were taken to the form and sufficiency of the complaint, but it is not necessary to pass upon such objections at this time, and therefore no further statement of the contents of the pleadings will be made.

Upon the filing of the complaint the court made its order to show cause why the relief prayed for in the com-

plaint should not be granted.  Upon the return of the order to show cause, and after answer had been filed and hearing had, the court granted a preliminary injunction restraining the corporation from transferring or disposing of its personal properties, refusing, however, at that time, to grant the statutory injunction prayed for in the complaint and further refusing at that time to appoint the receiver as prayed for in the complaint.  Thereafter, after various hearings had been had upon motions for rehearing and new trial, the court, upon the 22nd of June, 1908, filed its findings of fact as follows:

"Upon the pleadings and proofs submitted, it is found by the court that the defendant corporation is insolvent and cannot, as now conditioned, conduct its business in the future with safety to the public or advantage to the stockholders."

"A decree may accordingly be drawn granting the relief prayed in the complaint and as provided by Chapter 79 of the Laws of 1905."

Upon this finding of fact, after considerable delay, on the 18th of September, 1908, the court entered a decree, based upon the foregoing finding of fact, appointing one James Sims of Lincoln County receiver of all and every the estate, real, personal and mixed of the Eagle Mining and Improvement Company, with power to collect and take possession of all the properties and assets of the corporation.  That he make an inventory of the same and abide the further orders of the court.

At no time in the proceedings was the injunction provided in Section 72 of Chapter 79, of the Laws of 1905, granted or issued by the court as directed in his findings.

From this decree appointing a receiver the plaintiff in error sued out his writ and brings the matter before this court.

## OPINION OF THE COURT.

WRIGHT, J.—1.  Before taking up the consideration of the other features of this case it is necessary to dispose of the motion of defendant in error to dismiss the

writ of error for failure to file transcript of the record and assignments of error within the time required by law.

Defendant herein, on January 5, 1910, filed his motion to dismiss the writ of error, as above stated. An examination of the files in this case discloses that plaintiff in error had filed its transcript of record and assignments of error and thereby cured its default prior to the filing of motion to dismiss for such default. This motion is, therefore, within the rule stated in Armijo v. Abeytia, 5 N. M., and must therefore be overruled.

2. The second contention of the defendant in error is that the decree appointing a receiver, from which the writ of error is taken, is not a final decree and therefore not subject to appeal or writ of error.

The question of the finality of a decree granting the injunction and appointing a receiver as provided in Secs. 72 and 73 of Chapter 79 of the Laws of 1905, has been heretofore considered by the court, at this term, in the case of Sacramento Valley Irrigation Company v. Lee, in which a decree granting the injunction as provided in the statute and appointing a receiver with the powers prescribed in the statute was held to be final and subject to appeal or writ of error. In the case at bar, however, the facts differ from those in the Sacramento Valley Irrigation Company v. Lee, in that at no time was the injunction authorized by Sec. 72 of said Chapter 79 issued by the court as prescribed in such statute. The only injunction granted at any time, as appears from the record, was the preliminary injunction granted upon the return of the order to show cause, restraining the corporation from disposing of its personal property until the further order of the court. It is true that subsequent to the issuing of this preliminary injunction the court by its findings indicated that a decree granting the relief prayed in the complaint might be drawn and submitted to the court for signature, but no such decree was drawn or signed. The decree appointing such receiver is in the usual form of such decrees appointing receivers to conserve property pending final disposition of the case in chief under orders from the court.

Sections 72 and 73 of Chapter 79 of the Laws of 1905 are as follows:

"Sec. 72.    Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, any creditor or stockholder may by complaint setting forth the facts and circumstances of the case, apply to the district court for a writ of injunction and the appointment of a receiver or receivers or trustees, and the court being satisfied by affidavit or otherwise of the sufficiency of said application, and of the truth of the allegations contained in the complaint, and upon such notice, if any, as the court by order may direct, may proceed in a summary way to hear the affidavits, proofs and allegations which may be offered on behalf of the parties, and if upon such inquiry it shall appear to the court that the corporation has become insolvent and is not about to resume its business in a short time thereafter with safety to the public and advantage to the stockholders, it may issue an injunction to restrain the corporation and its officers and agents from exercising any of its privileges or franchises and from collecting or receiving any debts, or paying out, selling, assigning or transferring any of its estate, moneys, funds, lands, tenements or effects, except to a receiver appointed by the court, until the court shall otherwise order."

"Sec. 73.    The District Court, at the time of ordering said injunction, or at any time afterwards, may appoint a receiver or receivers or trustees for the creditors and stockholders of the corporation, with full power and authority to demand, sue for, collect, receive and take into their possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, papers, choses in action, bills, notes and property of every description of the corporation, and to institute suits at law or in equity for the recovery of any estate, property, damages or demands existing in favor of the corporation, and in his or their discretion to compound and settle with any debtor or creditor of the corporation or with persons having possession of its property or in any way responsible at law or in equity to the corporation at the time of its in-

solvency or suspension of business, or afterwards upon such terms and in such manner as he or they shall deem just and beneficial to the corporation, and in case of mutual dealings between the corporation and any person to allow just off-sets in favor of such person in all cases in which the same ought to be allowed according to law and equity; a debtor who shall have in good faith paid his debt to the corporation without notice of its insolvency or suspension of business, shall not be liable therefor, and the receiver or receivers or trustees shall have power to sell, convey and assign all the said estate, rights and interests, and shall hold and dispose of the proceeds thereof under the directions of the district court; the word receiver as used in this act shall be construed to include receivers and trustees appointed as provided in this act."

In passing upon the question of the finality of a decree appointing a receiver for an insolvent corporation independently and separately from the injunction provided in Section 72 quoted *supra,* Stevenson, V. C., in the case of Pierce v. Old Dominion Copper Mining and Smelting Company, 58 Atl. 319 at 326, uses the following language:

"The order appointing a receiver is not necessarily a part of the final decree. The final decree is the decree for an injunction, this most effective and fatal decree, which virtually destroys the corporation, like a judgment of ouster in a quo warranto case, and prevents the corporation from perpetrating fraud. The order appointing a receiver may be made in connection with and as a part of the final decree, or may be made at any time after the final decree, as the statute expressly provides. The order appointing a receiver may be embodied in the final decree, or may constitute the subject-matter of a separate subsequent order. Considered by itself, the order appointing a receiver is properly to be classified among interlocutory orders. It has never been intimated, so far as I am aware, that the decree of the court of chancery made upon the summary hearing prescribed by the statute, either dismissing the petitioner's petition or the complainant's bill, or ordering that the statutory injunction be issued, disabling the corporation from the exercise of its franchises, is not a

final decree." See also the case of Franklin Electric Light Co. v. Fort Wayne Electric Corporation, 58 N. J. Eq. 543, 43 Atl. 650.

The wording of the decree in the case at bar in itself indicates that the decree appointing such receiver should be merely an interlocutory order. Such being the case the order as it now stands appointing a receiver, being purely interlocutory in form, is not subject to appeal or writ of error. If the decree appointing a receiver in this case had been drawn with an order or decree granting the injunction provided in the statute, there could be no question whatever but what such decree would be a final decree and as such subject to appeal or writ of error.

There may be some question as to just what the *main case is* in which the decree appointing the receiver is deemed interlocutory, but this is not a question we are bound to consider in this court. Such question can be disposed of by the lower court on a motion to reform the decree so as to correspond with the findings of fact made by the court.

In view of the above we cannot go into the merits of the case. The writ of error is therefore dismissed with costs and it is so ordered.

---

[No. 1213, September 1, 1910.]

MACARIO TORRES, Appellant, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF TORRANCE, NEW MEXICO, Appellees.

SYLLABUS (BY THE COURT.)

1. An action brought by a taxpayer to restrain a board of county commissioners from contracting for or erecting a court house or jail at a certain town because said town was not the lawful county seat of that county, for the reason that the act of the legislature designating said town to be the county seat is unconstitutional and void, is a collateral attack on the validity of the location of said county seat and therefore not maintainable.

Appeal from the District Court for Torrance County before JOHN R. McFIE, Associate Justice. Affirmed.

A. B. RENEHAN for Appellant.

The functions of county government shall be exercised at the county seat. C. L. 1897, secs. 662, 749; Act of Congress, July 30, 1886, C. L. 1897, p. 45; Act of Congress, July 19, 1888, sec. 2; Laws 1903, ch. 70, sec. 3; Laws 1905, ch. 2; Territory v. Clark, 99 Pac. 698.

Injunction is the proper remedy to prevent the wrongful use or application of public funds and a taxpayer may bring the suit. Rice v. Smith, 9 Iowa 570; Marble v. McKinney, 60 Me. 333; Maloy v. Madget, 47 Ind. 241; Spencer v. School District, 15 Kans. 202; Nunda v. Crystal Lake, 79 Ill. 311; Burness v. Multnomah County, 60 Pac. 1005; Shepherd v. Easterling, 61 Neb. 882; Snyder v. Foster, 77 Iowa 638; Harney v. Railroad.Co., 32 Ind. 244; Johnston v. County of Sacramento, 137 Cal. 204; Bradford v. County of San Francisco, 112 Cal. 537; Barry v. Goad, 89 Cal. 215; Winn v. Shaw, 87 Cal. 632; New London v. Brainard, 22 Conn. 552; 2 High on Injunctions, sec. 1298, n. 2; Mayor v. Gill, 31 Md. 371; City of Chicago v. Nichols, 177 Ill. 97; Frederick v. Douglas County, 96 Wis. 411; Muller v. Eau Claire County, 108 Wis. 304; Winston v. Railroad Co., 1 Baxter 60; Rothrock v. Carr, 55 Ind. 334; Brockman v. City of Creston, 79 Iowa 587; Tifft v. City of Buffalo, 65 Barb. 460; Watson v. Sutherland, 5 Wall. 78.

This is not a proceeding to fix the status of a county seat. Rice v. Smith, 9 Iowa 570; Ford v. Farmer, 9 Hum. 152; 29 Cyc. 1393, sec. 5. Estancia is not even a de facto county seat for such office or tenure cannot exist. Norton v. Shelby County, 118 U. S. 426; 29 Cyc. 1391, note 54.

E. C. ABBOTT, F. H. AYERS, C. R. EASLEY and MANN & VENABLE for Appellee.

The location of a county seat cannot be raised in a collateral proceeding by a private individual but can only

be raised by the state in a direct proceeding for that pur-
pose.   Robinson v. Moore, 25 Ill. 118; In re Allison, 22
Pac. 820; In re Short, 27 Pac. 1005; Ashley v. Board of
Supervisors, 60 Fed. 55; Presidio County v. State National
Bank, 20 Texas Civ. App. 511, 44 Southwestern 1069;
State v. Rich, 20 Mo. 393; Speck v. The State, 7 Baxt.,
Tenn., 46; State v. Judges, 43 La. An. 125; Watts v. State,
22 Texas App. 572; Territory v. Clark, 99 Pac. 697.

The question of whether or not Estancia is the county
seat of Torrance County can only be raised by the Terri-
tory itself by an information in the nature of *quo warranto*.
11 Cyc. 368; 7 Am. & Eng. Enc., 2d ed., 1045; Robinson
v. Moore, 25 Ill. 118; State v. Judges, 43 La. Ann. 125;
Watts v. State, 22 Tex. App. 572.

The acts of the legislature of 1903 and 1905 should
be construed together and, in effect, create a new county
and locate the county seat thereof.   Laws 1903, ch. 7;
Laws 1905, ch. 2; Springer Act, 7 Fed. St. Ann. 264, and
amendment 268; 1 Lewis Sutherland Stat. Con., sec. 237.

If the legislature however acts directly, in locating a
county seat, no judicial question can be made as to the
propriety or validity of its action, and if it acts through
the medium of officers or agents, no judicial question can
be made as to the propriety or validity of the acts of its
officers or agents, unless the legislature makes special pro-
visions therefor, but redress must be had through the leg-
islature.   11 Cyc. 366; Smith v. Adams, 130 U. S. 167,
32 L. ed., 1895; Walker v. Tarrant Co., 20 Tex. 16; Hen-
rick v. Rouse, 17 Ga. 56; McClelland v. Shelby Co., 32
Tex. 17; State v. Dorsey Co., 28 Ark. 378; Lusher v.
Scites, 4 W. Va. 11.

## OPINION OF THE COURT.

ABBOTT, J.—This is an action brought by appel-
lant, a taxpayer of Torrance County, praying an injunction
to restrain the Board of County Commissioners of Tor-
rance County from "building, contracting for or in any
manner authorizing, permitting or allowing the construc-
tion of a court house or other county buildings for said
County of Torrance in or at the town of Estancia," for

the reason that said town is not the lawful county seat of Torrance County. A temporary injunction was granted.

The appellee demurred for the reason, among others, that the action was a collateral attack upon the validity of the location of a county seat. The demurrer was sustained and injunction dissolved.

If this act is a collateral attack on the validity of the location of the county seat of Torrance County, then the judgment of the lower court must be affirmed. Territory v. Clark, 99 Pac. 697; 11 Cyc. 368.

That this is a collateral attack, there can be no doubt. An attack which would not be a collateral attack would be a proceeding in the nature of *quo warranto*. The objection to deciding, or attempting to decide, a question of this kind was forcibly stated by the court in Dean v. Kimmick, et al., 122 N. W. 245, in these words:

"But in this proceeding it is not attempted to show that the right which the petitioner seeks to secure is one which affects him in any way peculiar to himself, and from the nature of the controversy we must assume that it only affects him in the same manner as it affects all other taxpayers and citizens of the county, all of whom are interested in the location of the county seat. In such a case we think the matter should not be litigated in this manner. The public has a right to be heard; and, if we desire to determine the constitutionality of the statute in question, and on which the result may depend, we should have to pass upon the rights of the public at the instigation of a private citizen, in his personal capacity as a private suitor. In the meantime other proceedings by other private individuals, might be instituted, the rights of none of whom would be settled by the decision in this case. Each citizen of the county might see some additional reason why the law should be held constitutional or unconstitutional, and desire to present it to the court."

See also Ashley v. Board of County Com., 60 Fed. 55 (C. C. A.)

The case is distinguishable from Vigil v. Stroup decided at our present sitting. The term of office in question in that case had ended and it had ceased to be a question

of public interest who was entitled to hold the office at the time when the cause of action which was for the emoluments accrued. But the public affairs of Torrance County are being conducted every day at Estancia as the county seat and that has been the case for five years past. Most acts done in the conduct of those affairs pass unchallenged. Occasionally some act is called in question by a private individual for his own purposes, as in the case at bar, but the question of the validity of the statute under consideration will remain without authoritative settlement until it is determined in a direct proceeding.

Counsel for appellant cite the case of Norton v. Shelby County, 118 U. S. 426, as in point and decisive in this case, but we do not consider it in point and believe that it was successfully distinguished and shown not to be inconsistent with the holding such as we have announced in this case in the case of Ashley v. Board of County Co., *supra.*

The judgment of the lower court will be affirmed; and it is so ordered.

---

[No. 1324, September 1, 1910.]

MICHAEL O'NEILL, Appellant, v. F. J. OTERO, Special Master, Appellee.

SYLLABUS (BY THE COURT.)

1. The attempt of an agent employed to do the annual assessment work on a mining claim, after failure or intentional neglect to do such work, to relocate the claim even though such attempted relocation is made in the name of a third party from whom the agent subsequently obtains title by deed, is fraud upon his principal.

2. One who takes advantage of his position as agent and representative of another and thereby fraudulently obtains title to certain mining claims which in equity and good conscience belong to his principal, will be charged in equity as a trustee ex maleficio of his principal.

Appeal from the District Court for Santa Fe County before JOHN R. McFIE, Associate Justice. Affirmed.

HANNA & WILSON and N. B. LAUGHLIN for Appellant.

The claims were open for relocation. Rev. St. U. S., sec. 2324; Saunders et al, v. Mackey, 6 Pac., Mont., 361; Doherty v. Morris, 16 Pac., Colo., 911; Lockhart v. Wills, 54 Pac., N. M., 336; Book et al, v. Justice Mining Co., 58 Fed. 106; Belk v. Meagher et al, 104 U. S. 279; Oscamp v. Crystal River M. Co., 58 Fed. 293; Book v. Justice Mining Co., 58 Fed. 106.

If the defendant below, as receiver, was in possession of the property, then the plaintiff had an adequate remedy at law in the form of an ejectment. The Lebanon Mining Co. v. The Con. Rep. M. Co., 6 Colo. 371; Sears v. Taylor, 4 Colo. 38.

Appellant was not a trustee under a constructive trust. 1 Parsons on Contracts 427.

A witness should be permitted to explain the circumstances under which the affidavit was made. Matter of Blain, 16 Daly, N. Y., 540, 16 N. Y. Sup. 874, 879; Perry v. Perry, 2 Bard Ch., N. Y. 285, 288; 2 Moore on Facts, 1106, 1107; Coker v. Dawkins, 20 Fla. 141; Anderson v. Collins, 6 Ala. 783; Muller v. Legendre, La., 17 South. 500.

Fraud must be proven by the preponderance of the evidence. Means v. Flanagan, 79 Ill. App. 246; State Sav. Bank of Missouri Valley v. Emge, Iowa, 108 N. W. 530; Hutchinson v. Poyer, 44 N. W. 327, 79 Mich. 337; Redwood v. Rogers, 53 S. E. 6, Va.; Bowe v. Gage, 106 N. W. 1074, 127 Wis. 245.

Appellant at most was nothing more than an independent contractor. Powell v. Virginia Const. Co., 88 Tenn., 13 S. W. 691; Harris v. McNamara, 97 Ala. 181, 12 So. 103; Barg v. Bonsfield, 65 Minn. 355, 68 N. W. 45; Burns v. McDonald, 57 Mo. App. 599; Casement v. Brown, 148 U. S. 615; Indiana Iron Co. v. Craig, 19 Ind. App. 565, 48 N. E. 803, 807.

Confidential and fiduciary relation. Robins v. Hope,

O'Neill v. Otero, Master.

57 Cal. 493, 497; Story Eq. Jr. 218; McDermott Mining Co. v. McDermott, 69 Pac. 715.

Fraud in securing the property is the essential element, to impose a constructive trust. Crissman v. Keester, 223 Ill. 69, 79 N. E. 58; Scribner v. Meade, Ariz., 85 Pac. 477; Davis v. Davis, Pa., 65 A. 622.

It has been repeatedly held that to show a constructive trust, the proof must be clear and convincing. Schrough v. Anthes, Neb., 98 N. W. 676.

E. W. DOBSON for Appellee.

A fiduciary relationship existed. I Lindley on Mines, 1 ed., sec. 407; Argentine Mining Co. v. Benedict, 18 Utah 183, 55 Pac. 560; Largey v. Bartlett, Mont., 44 Pac. 962, syllabus; Lockhart v. Rollins, 21 Pac. 413; Utah Min. and Man. Co. v. Dickert & Myers Sulphur Co., 21 Pac. 1002; Moore v. Crawford, 130 U. S. 122, 32 Law ed. 878; Butler v. Watkins, 13 Wall. 456, 20 L. ed. 629; Angle v. Chicago St. P. M. & O. R. Co., 151 U. S. 1; Lockhart v. Leeds, 195 U. S. 427, 49 Law ed. 263; Sanders v. Mackey, 5 Mont. 523, 6 Pac. 361; Dougherty v. Morris, 11 Colo. 16 Pac. 911; Lincoln v. Sierra Gold Mining Company, 25 Fed. 337; Wilson v. Castro, 31 Cal. 420; Salmon v. Symonds, 30 Cal. 301; Bludworth v. Lake, 33 Cal. 256; Hardy v. Hardin, 4 Sawy. 549; Hunt v. Patchin, 35 Fed. 816; Fisher v. Bishop, 2 Am. St. Rep. 257, syllabus.

Ejectment. Lockhart v. Johnson, 181 U. S. 561, L. ed., 45, 979.

STATEMENT OF THE CASE.

On the 6th day of April, 1909, appellant filed suit against F. J. Otero, as special master, and alleged that on the 1st day of January, 1908, in the County of Santa Fe, one Joseph DeLallo, a naturalized citizen of the United States discovered and located certain mineral lands in the Los Cerrillos Mining District, Santa Fe County, New Mexico, under the name of the "Square Deal," "York," "Gold Coin" and "Zinc Blend." The complaint then sets

forth the amount and character of work done upon said four mining claims.

That on the 16th day of March, 1909, Joseph DeLallo, as locator of said mining claims, conveyed the same to Michael O'Neill, the appellant in this cause. The complaint then alleges that F. J. Otero, special master and appellee, was on the 7th day of January, 1909, appointed special master in a certain cause then pending in the District Court for Santa Fe County, wherein Thomas K. D. Maddison was plaintiff and the Consolidated Mining & Smelting Company was defendant and as such special master, appellee was authorized to sell at public auction certain lands, mining claims and premises belonging to the defendant corporation, the Consolidated Mining & Smelting Company, and among the property which said special master was directed to sell were the following mining claims: "Tom Paine," "Golden Eagle," "Sukie," "Sukie, Jr.," "Albany" and "Santiago" mining claims also situate in the Los Cerrillos Mining District in said County of Santa Fe; that said six mining claims were valid and existing mining claims containing an area of 300 to 1500 feet surface ground and had been located many years prior thereto; said complaint then alleges that during the year 1907, the annual assessment work or the expenditure of $100 upon each of said mining claims was not done or performed, and by reason of such failure to cause to be done $100 worth of work, the said six mining claims, last above mentioned, became and were abandoned and forfeited and reverted to the United States, and on the 1st day of January became a part of the public unoccupied mineral lands and subject to location by any person or persons qualified under the mining laws to locate mining claims, and that the said Joseph DeLallo located the ground covered by the six mining claims, last above mentioned, in the names of the "Square Deal," "York," "Gold Coin" and "Zinc Blend" mining claims, each of said claims containing an area of 600 by 1500 feet surface ground.

It was further alleged that the said four claims, last above mentioned, covered practically the surface ground that was covered and claimed under the six mining claims,

owned and claimed by the Consolidated Mining & Smelting Company. Said plaintiff further alleged that the said F. J. Otero, as special master, had advertised said six mining claims, together with other property for sale at public auction, under and by virtue of a decree rendered in said cause wherein said appellee was appointed special master; said sale was advertised to take place on the 14th day of April, 1909, at the front door of the court house in Santa Fe County, New Mexico. The plaintiff and appellant prayed for an injunction enjoining and restraining said F. J. Otero, as such special master, from offering for sale and from selling the said six mining claims and from in any manner interfering with or disturbing appellant in his quiet and peaceable possession of said premises, under and by virtue of the location thereof made by the said Joseph DeLallo, who had conveyed the same to Michael ONeill, appellant, by deed March 16, 1908.

Attached to the complaint is a copy of the location notices filed by DeLallo and the deed from DeLallo to appellant. Upon the filing of said complaint, a temporary writ of injunction was issued and made returnable on the 12th day of April, 1909.

The defendant and appellee filed an answer to said complaint on the 10th day of April, 1909, and denied each and every material allegation in said complaint alleged with reference to the location of said premises by Joseph DeLallo and denied that the annual assessment work upon said six mining claims, owned by the Consolidated Mining & Smelting Company, had not been done and performed for the year 1907, and denied that the said ground was on the 1st day of January, 1908, subject to location or that the said corporation had forfeited or abandoned said mining claims.

The appellee admitted that he was appointed special master in that certain suit brought by Thomas K. D. Maddison, as plaintiff, against the Consolidated Mining & Smelting Company, as defendant, and alleged that under and by virtue of the decree and the order appointing him, he was authorized and directed to sell and dispose of at public auction the property in said decree described which

belonged to the Consolidated Mining & Smelting Company and further admitted that included in the advertisement that was then being published in the Santa Fe New Mexican, was the said "Tom Paine," "Golden Eagle," "Sukie," "Sukie Jr.," mining claims and also the "Albany" and "Santiago" mining claims, and defendant denied that the said six mining claims, above mentioned, were abandoned by the owner thereof during the year 1907, by failure to do the annual assessment work required by the laws of the United States and the Territory of New Mexico, and denied that on the 1st day of January, 1908, the ground covered by said six mining claims, last above named, was public domain and subject to location by any person or persons authorized under the mining laws of the United States to explore, discover and locate mineral lands; and said defendant and appellee further denied that the said Joseph DeLallo did on the 1st day of January, 1908, discover and locate said four mining claims, called the "Square Deal," "York," "Gold Coin" and "Zink Blend."

Appellee admitted that he had advertised the said six mining claims for sale, together with other property, and that it was his intention to sell the same at public auction on the 14th day of April, 1909, together with all improvements thereon. He likewise admitted that if the said sale took place and the court approved the same, that he would convey to the purchaser thereof the property described in said notice of sale, and said appellee admitted that unless restrained by the court he would at the time and place in said notice of publication set forth, sell said property at public auction. Appellee in his answer further alleged that the said Michael O'Neill, appellant, in this cause, had ever since the year 1903, performed or caused to be performed the annual assessment work of the value of $100 on each of said six mining claims, owned by the Consolidated Mining & Smelting Company, including the year 1907; and further alleged that the said Michael O'Neill commenced to do the work upon said mining claims in the month of September, 1907, under and in pursuance of an agreement made by and between one W. A. Brown, the agent and representative of the Consolidated Mining

& Smelting Company, with the said Michael O'Neill, and that the said appellant informed the agent of the said Consolidated Mining & Smelting Company on the 27th day of December, 1907, that the annual assessment work upon the said four mining claims had been done and performed for the year 1907, and would be completed on the "Santiago" and "Albany" by the 5th day of January, 1908.

Appellee further alleged that on the 3rd day of January, 1908, he was appointed receiver of all the property belonging to the Consolidated Mining & Smelting Company, under and by virtue of an order made in the case brought by the said Thomas K. D. Maddison, as plaintiff, against the Consolidated Mining & Smelting Company, and as such receiver he duly qualified and took possession of the property belonging to said company and on the 30th day of January, 1908, one W. A. Brown, the agent and representative of appellee, as receiver, in said cause, tendered to the said O'Neill the sum of $200 for and on account of the annual assessment work done for the Albany and Santiago mining claims, and further alleged that appellant in the early part of December, 1907, commenced to do the annual assessment work upon the Santiago and Albany mining claims and if the $100 worth of work had not been completed on the 1st day of January, 1908, that appellant continued to perform the work upon said mining claims, until at least $100 worth of work had been done.

Defendant and appellee further alleged fraud and conspiracy on the part of the said O'Neill and a combination entered into between appellant and DeLallo Bros. and denied that the appellant was entitled to an injunction.

Upon the hearing of the motion to dissolve the temporary injunction, the court continued the injunction until the final hearing of the case and thereafter appellant filed a reply to the answer denying in general all the new matter set up by appellee and especially denied that he had performed any work upon said six mining claims on account of the annual assessment work for the year 1907.

Defendant and appellee was permitted by the court to amend his answer and alleged and charged that appellant, Michael O'Neill, acting as the agent of the Consoli-

dated Mining & Smelting Company, wrongfully, wilfully and fraudulently concealed from said company and its agent and representative W. A. Brown, the fact that the said annual assessment work upon said six mining claims had not been done for the year 1907, and thereafter combined and fraudulently conspired with Thomas DeLallo and Joseph DeLallo, or one or both of them, and procured them to relocate said six mining claims in the names of the "Square Deal," "York," "Gold Coin" and "Zinc Blend" for the purpose of defrauding and defeating the title of said company to the same; and defendant further alleged that the said Michael O'Neill, appellant, in order to wrongfully and fraudulently deceive the said company and its representative, W. A. Brown, falsely represented to said Brown that he had performed the annual assessment work upon said six mining claims, as required by law for the year 1907, and defendant by way of cross complaint alleged that the said Michael O'Neill did on the 5th day of August, 1907, agree to and with W. A. Brown, the agent and representative of the Consolidated Mining & Smelting Company, that he would do the annual assessment work upon said six mining claims for the year 1907, and was to receive the sum of $100 for the work done upon each of said claims, making a total sum of $600, and defendant further alleged that whether or not the said appellant did actually do the annual assessment work upon said six mining claims according to his contract and agreement, that after the 1st day of January, 1908, and after the said Joseph DeLallo had pretended to relocate said six mining claims, the said Michael O'Neill, caused to be done at least $100 worth of work upon each of said mining claims owned by the Consolidated Mining & Smelting Company, although he claimed that the work was done on behalf of Joseph De-Lallo upon the claims so claimed to have been relocated by him, and defendant alleges that by virtue of the fraud, combination and conspiracy between the said O'Neill and the DeLallo Bros. that the said appellant should be decreed a trustee to have done the work for the use and benefit of the mining company for the year 1908, and the defendant further alleged that the appellant when he acquired title

to said property in March, 1909, by receiving a deed from Joseph DeLallo, did so with full knowledge of all the equities and rights of the Consolidated Mining & Smelting Company in and to the same, and defendant prayed that the pretended location notices alleged to have been posted upon said claims by the said Joseph DeLallo on the 1st day of January, 1908, pretending to locate the same under said four names, be ordered cancelled and that the deed from Joseph DeLallo to appellant be likewise cancelled and held for naught and that appellant be required to quit claim to the Consolidated Mining & Smelting Company or to the defendant as receiver any lien, right, title or interest claimed by him, under and by virtue of the said deed and that he be decreed to be trustee *ex-maleficio* and to hold whatever title he had in said property for the use and benefit of the Consolidated Mining & Smelting Company and for the defendant receiver thereof, and that the work and labor performed upon said mining claims under the pretended re-location thereof by the said Joseph DeLallo be decreed to be done for the use and benefit of said company or the receiver.

Appellant filed a reply to the amended answer denying each and every allegation of new matter therein set forth.

At the close of the evidence the court made nineteen findings of fact and thereafter rendered a decree in accordance with the findings of fact.

Of the said findings two only are necessary to a consideration of this case, as follows:

"That the plaintiff, Michael O'Neill on or about August 5th, 1907, promised and agreed with the Consolidated Mining & Smelting Company through one W. A. Brown, its duly authorized agent and representative, to do and perform the annual assessment work on each of said six mining claims, amounting to not less than one hundred dollars ($100.00) upon each of said claims for the year 1907, and at the time of such promise an agreement to do said work said plaintiff did not demand payment in advance or security for the work proposed to be done, and said plaintiff from time to time thereafter notified said company, through its agent W. A. Brown, that the work

upon four of said claims was being done, and had been done, and that the work upon the Santiago and Albany claims was being done and prosecuted and such work would be continued until the full amount of assessment work of one hundred dollars ($100.00) had been done upon each of them."

"That the Consolidated Mining and Smelting Company and its agent from past business relations with plaintiff, who did the assessment work upon said mines for several years prior to 1907, relied upon the promise and agreement of the plaintiff to do the assessment work upon all of said six mining claims for said year 1907. That the said Michael O'Neill wrongfully, purposely, intentionally and fraudulently failed to do the work upon the said six claims as he had promised and agreed to do, in order to deceive and defraud said company and thereby prevent said Consolidated Mining and Smelting Company from doing or having the work done upon said claims for the year 1907, and that thereafter said plaintiff entered into a combination and conspiracy with Joseph DeLallo and Thomas DeLallo, either one or both of them, to relocate said mines and actually participated, aided and assisted the said Joseph DeLallo and Thomas DeLallo, or either or both of them, in the relocation of said mining claims, after midnight of the 31st day of December, 1907. That with the assistance and aid of the said plaintiff they pretended to have relocated said claims between midnight and four or five o'clock in the morning of the first day of January, 1908."

Two of the conclusions drawn by the court upon the foregoing findings of fact are also necessary to a determination of this case. They are in words as follows:

"The court further finds that the plaintiff Michael O'Neill having promised and agreed to do the annual assessment work upon said six mining claims for the year 1907 as herein found, occupied a confidential and fiduciary relation with the Consolidated Mining and Smelting Company and that the relocation of said mining claims in the manner in which the court has found whereby plaintiff participated, that any benefits that accrued therefrom

would and should be for the benefit of the owner, the Consolidated Mining and Smelting Company and not the relocator thereof."

"The court therefore finds as a matter of law that the plaintiff by reason of the facts herein found became trustee of said mining claims for the use and benefit of the Consolidated Mining and Smelting Company, the owner of said Tom Payne, Golden Eagle, Sukie, Sukie Jr., Santiago and Albany claims and that any and all work done or performed upon said claims by plaintiff or under his directions prior to December 31, 1907, or after January 1, 1908, whether claimed or pretended to have been done on the said claims as relocated, be decreed to have been done for the use and benefit of the said six mining claims and the said Consolidated Mining and Smelting Company, the owner thereof."

Upon the statements of facts and conclusions of law the court entered a decree dismissing the injunction and granting the defendant the affirmative relief sought in his amended answer by way of cross complaint. From the decree so entered the plaintiff appealed to this court.

OPINION OF THE COURT.

WRIGHT, J.—Appellant assigns twelve grounds of error, the first ten of which are to the same effect, viz., that the court erred in finding and holding certain facts and conclusions of law set out in its written findings and final decree. The remaining two assignments go respectively to the jurisdiction of the court to try the case without a jury, and the admission of illegal and improper testimony. Upon the hearing, and in the briefs, the appellant abandoned the 11th and 12th assignments of error and therefore the same will not be considered by the court.

1. The third assignment of error sets out that the court erred in finding and holding that the appellant promised and agreed, on or about the 5th day of August, 1907, or at any other time, with the Consolidated Mining and Smelting Company, through its agent, W. A. Brown, or otherwise, to do and perform the annual assessment work upon the six mining claims for the year 1907, and in

finding and holding that the appellant from time to time notified the Consolidated Mining and Smelting Company, through its agent W. A. Brown, or otherwise, that such work was being done, or that any of such work had been done. In discussing this finding of fact the appellant contends that there was no testimony in the record to support such finding, except the testimony of W. A. Brown, the resident agent of the Consolidated Mining and Smelting Company, and further contends that W. A. Brown was a discredited witness before the court and as such, his testimony was not entitled to any weight. This case was tried before the court without a jury and the court had an opportunity to observe the conduct and demeanor of the witness upon the stand and was the judge of the weight to be given to the evidence of such witness as W. A. Brown. The appellant further contends that there is nothing whatever in the record to corroborate the testimony of W. A. Brown.

It appears from the record that upon the trial W. A. Brown, for the purpose of refreshing his memory as to certain dates and circumstances, referred to and read, from his letter press copy book, extracts from certain letters written by him to the officers of the Consolidated Mining and Smelting Company at Erie, Pa. Appellant contends that the very fact that these copies were used instead of the original letters ,casts suspicion upon such testimony. An examination of the record, however, discloses that counsel for the appellant made *no objection whatever* to the use of such letter press copies, and he cannot be heard to complain of secondary evidence, at this late date. An examination of the record also discloses that the appellant, in March, 1908, went back to Erie, Pa., and entered into negotiations with Mr. Thomas Brown and Mr. Rosenzweig, the president and attorney, respectively, of the Consolidated Mining and Smelting Company, looking to a settlement of certain claims he and DeLallo, who had relocated the six mining claims which are the subject of controversy herein, claimed against the Consolidated Mining and Smelting Company. At such time he made statements to Mr. Brown and Mr. Rosenzweig, as testified to by them by depositions, which are in direct conflict with his testimony given upon

O'Neill v. Otero, Master.

the witness stand, and also, at that time, signed certain instruments introduced in evidence, which are in direct conflict with his testimony given upon the witness stand. The testimony given by Mr. Brown and Mr. Rosenzweig, and the instruments signed by the appellant are directly corroborative of the testimony of W. A. Brown. It therefore appears from a careful examination of the record in this case, that the findings of fact so made by the court are sustained by a clear preponderance of the evidence.

2.   The appellant also took an exception to the finding of fact by the court that the appellant wrongfully, intentionally and fraudulently neglected to .do the work on said six claims as he had promised and agreed, with the intention of deceiving and defrauding said company, and that thereafter the plaintiff entered into a combination and conspiracy with Joseph and Thomas DeLallo to relocate said mines and actually participated, aided and assisted the said Joseph DeLallo and Thomas DeLallo in the relocation of said mining claims after midnight of the 31st day of December, 1907, thereby fraudulently securing to himself, through a subsequent transfer of title made to him by DeLallo in March, 1908, the said six mining claims formerly owned by the Consolidated Mining & Smelting Company.

In considering this finding the appellant contended that there was no direct evidence whatever in the record upon which such finding could be based; that the court based his finding solely upon suspicion and inference. Upon examining the record, however, we are unable to come to any such conclusion. The testimony of .both Thomas and Joseph DeLallo and that of the appellant relating to the circumstances surrounding the relocation made after midnight of December 31, 1907, clearly indicate that such relocation was made in fraud of the rights of the Consolidated Mining and Smelting Company by the appellant and the two DeLallos working together. The subsequent actions of the appellant, O'Neill at Erie, in the presence of Thomas Brown and Mr. Rosenzweig fully corroborate such a finding so made by the court.

3.   The findings of fact by the court being fully sus-

tained by a clear preponderance of the evidence, there remains to be considered the question of whether or not the conclusions of law based thereon are correct.

By reason of his contract and agreement made August 5, 1907, to do the annual assessment work upon the six mining locations involved herein, the appellant became the agent of the Consolidated Mining and Smelting Company for that purpose. An examination of the record discloses the fact that for a number of years prior to 1907, O'Neill had been regularly employed to do this assessment work; that at the time he so conspired with the DeLallos in the relocation of said mining claims he was residing in a house belonging to the Consolidated Mining and Smelting Company upon one of the claims so relocated. It further appears that during the years prior to 1907 the company had placed implicit confidence in O'Neill and relied upon him to do the assessment work. The evidence further shows pears that during the years 1903 to 1906 inclusive O'Neill had faithfully attended to the assessment work and had been paid therefor.

In Vol. 1, Lindley on Mines (1st ed.) Sec. 407, it is held: "An agent, trustee or other person holding confidential relations with the original locator will not be permitted to relocate mining claims and secure to themselves advantages flowing from a breach of trust obligations."

This doctrine is sustained in the case of Argentine Mining Company v. Benedict, 18 Utah 183, 55 Pac. 560; Lockhart v. Leeds, 195 U. S. 427; Lakin v. Sierra Buttes Gold Mining Co., 25 Fed. 337; Lockhart v. Rollins, 2 Idaho 503, 514, 21 Pac. 413; Largey v. Bartlett, 18 Mont. 265, 44 Pac. 962; Fisher v. Seymour, 23 Colo. 542, 49 Pac. 30.

It therefore follows that the appellant having taken advantage of his position as agent and representative of the Consolidated Mining and Smelting Company and thereby fraudulently obtained title to the said mining claims, which in equity and good conscience belong to the Consolidated Mining and Smelting Company, he will be charged in equity as a trustee of the Consolidated Mining and Smelting Company, the equitable owner there-

of.   Lakin v. Sierra Buttes Gold Min. Co., cited *supra.*
Hunt v. Patchin, 35 Fed. 816.

The attorney for the appellant in his brief contends
that the mere fact that the appellant agreed to do the an-
nual assessment work upon these mining claims for the year
1907, created no such confidential or fiduciary relationship·
as is contended for by the appellee.   However, we think
that it is clearly settled by the courts that the agreement
made by the appellant with the Consolidated Mining and
Smelting Company under the circumstances under which
the same was made, clearly indicates that such a fiduciary
relationship did exist.

We conclude, therefore, that the findings of fact made
by the trial court are clearly sustained by the preponder-
ance of evidence and that the conclusions of law drawn
therefrom by the court are correct.

There being no error apparent in the record, the judg-
ment of the lower court is affirmed, and it is so ordered.

---

[No. 1337, September 1, 1910.]

F. H. GOESLING and ADOLPH GOESLING, Partners,
Doing Business Under the Firm Name and Style of
Goesling Brothers, Appellees, v. GROSS, KELLY &
COMPANY, a Corporation, Appellant.

### SYLLABUS (BY THE COURT.)

1.   Allegations as to time need not be proven with
precision.

2.   The evidence in this case examined and held that
appellant was appellee's factor.

3.   Where instructions given by principal to a factor
were not contemporaneously with the advancement or con-
signment, but were given before the sale and were received,
accepted and acquiesced in, such instructions were as bind-
ing upon the factor as if given at the time of the advance-
ment or consignment.

4. Held there were no disputed questions of fact requiring the submission of the case to the jury.

5. Where a principal instructed his factor to hold wool consigned by the principal at a certain price and factor failed to hold and sold at a lower price. Held, upon suit brought by principal to recover damages from factor the principal is entitled to recover of the factor the difference between what the wool actually sold for, and the highest price attained by the wool up to the date of the trial, not to exceed the limit fixed by the principal.

Appeal from the District Court for Bernalillo County before IRA A. ABBOTT, Associate Justice. Affirmed.

E. W. DOBSON for Appellant.

Appellant was agent not factor. 3 Words and Phrases 2640; 19 Cyc. 186; Eickel v. Sawyer, 44 Fed. 845; Delaune v. Agar, La., McGloin 97, 100; State v. Thompson, 25 S. W. 346, 348, 120 Mo. 12; Story Ag., sec. 33; Edgerton v. Michels, 26 N. W. 748, 750, 66 Wis. 124; Ruffner v. Hewitt, 7 W. Va., 585, 604, 605; Commonwealth v. Keller, 9 Pa. Co., Ct. Rep. 253, 255; Graham v. Duckwall, 71 Ky., 8 Bush. 12, 17; Kellogg v. Costello, 67 N. W. 24, 26, 93 Wis. 232; Higgins v. Moore, 34 N. Y. 417, 418.

Right of factor to control property for his interest and indemnity. Talcott v. Chew, 27 Fed. 276; Heffner v. Gynne-Treadwell Cotton Co., 160 Fed. 635, 87 C. C. A. 606; The Frances, 8 Cranch, 418, 419, 3 L. ed., 609; Brown v. McGran, 14 Peters, 479, 10 L. ed. 550; Field v. Farrington, 10 Wall. 141, 19 L. ed. 923; Eichel v. Sawyer, C. C., 44 Fed. 845, 850; Field v. Farrington, 10 Wall. 141; Brown v. McGran, 14 Pet. 479, L. ed. 10, 550.

Disputed questions of fact should have been submitted to the jury. Aetna Indemnity Co. v. J. R. Crowe Coal & Mining Co., 154 Fed. 545; Etting v. Bank, 11 Wheat. 59, 6 L. ed. 419; Rankin v. Fidelity Trust Co., 189 U. S. 242, 253, 23 Sup. Ct. 553, 557, 47 L. ed. 792; Railway Co. v. Ives, 144 U. S. 408, 417; Chicago & N. W. Ry. Co. v. De Clow, 124 Fed. 142, 145, 61 C. C. A. 34, 37; Trav-

elers' Ins. Co. v. Melick, 65 Fed. 178, 181, 12 C. C. A.
544, 547, 27 L. R. A. 629; Railway Co. v. Jarvi, 3 C. C.
A. 433, 437, 438, 53 Fed. 65, 69; Fuel Co. v. Danielson,
6 C. C. A. 636, 57 Fed. 915; Railroad Co. v. Kelley's
Adm'rs, 3 C. C. A. 589, 593, 53 Fed. 459, 463; Railway
Co. v. Ellis, 4 C. C. A. 454, 456, 54 Fed. 481, 483; Mc-
Namee v. Hunt, 87 Fed. 298, 301, 30 C. C. A. 653, 655;
West v. Smith, 101 U. S. 263, 270, 25 L. ed. 809; Brown
v. McGran, 14 Pet. 477, 493, 10 L. ed. 550; Goddard v.
Foster, 17 Wall. 123, 142, 21 L. ed. 589; Blakely v. Gregg,
8 Wall. 242, 268, 19 L. ed. 409; Barreda v. Silsbee, 21
How. 146, 167, 16 L. ed. 86; Turner v. Yates, 16 How.
14, 23, 14 L. ed. 824; Richardson v. City of Boston, 19
How. 263, 270, 15 L. ed. 639; Nash v. Classon, 45 N. E.
276, 277, 163 Ill. 409; Roberts v. Bonaparte, 20 Atl. 918,
73 Md. 191, 10 L. R. A. 689; Eureka Fertilizer Co. v.
Baltimore, etc., R. Co., 27 Atl. 1035, 1036, 78 Md. 179;
Gassett v. Glazier, 43 N. E. 193, 195, 165 Mass. 373; 1
Thompson on Trials, sections 1086, 1113, 1114; 4 Wig-
more on Evidence, sec. 2556; Sigerson v. Pomeroy & An-
drews, 13 Mo. 620.

A factor who wrongfully sells goods of his principal
below the price limited in his instructions, is presumptively
liable for damages as if the limited price were the true
value of the goods, but evidence that the factor acted in
good faith, and the limited price could not have been
realized, and that the property was sold at the full market
price at the time of the sale, is admissible and then if the
factor is liable at all, he is liable for the highest value
that the wool, of the same kind and character of appellee's,
was sold for at any time up to the institution of the suit.
Frothingham v. Everton, 12 N. H. 239; George McNeill,
26 Am. Dec. 498.

NEILL B. FIELD for Appellees.

Allegations of time, quantity, value, etc., need not
be proved with precision. C. L. 1897, sec. 2685, sub-secs.
68, 78, 85, 94, 96; U. S. v. Le Baron, 4 Wall. 648; Gray-
son v. Lynch, 163 U. S. 476; Marshall v. Russell, 44 N.

H. 509; Little v. Blunt, 33 Mass. 365; Jordan v. Cooper, 3 Serg. & Raw., Pa., 576; Biven v. Bostwick, 70 Cal. 639.

Defendant was plaintiff's factor. Slack v. Tucker, 23 Wall. 330; Heffner v. Gwynne-Treadwell Cotton Co., 160 Fed. Rep. 638, 639; Brown v. McGran, 14 Peters 479; Field v. Farrington, 10 Wall. 141; Gallagher v. Jones, 129 U. S. 193.

There was no conflict of evidence upon any material point. Rankin v. Fidelity Trust Co., 189 U. S. 253; McGuire v. Blount, 199 U. S. 147, 148; Empire State Cattle Co. v. Atchison Ry. Co., 210 U. S. 9, 10; Noble v. Crane & Co., 169 Fed. Rep. 59, 60; Railway Co. v. Lowery, 74 Fed. Rep. 463; Travelers' Ins. Co. v. Randolph, 78 Fed. Rep. 754.

The measure of damages adopted by the court below is not properly reviewable in this court. Cunningham v. Springer, 204 U. S. 647; George v. Emery, 107 Pac. 3; T. & P. Ry. Co. v. Book, 151 U. S. 73; Frothingham v. Everton, 12 N. H. 239; Maynard v. Pease, 99 Mass. 555; Sutherland on Damages, vol. 3, sec. 777, vol. 4, sec. 1119; McKinley v. Williams, 74 Fed. Rep. 103; Loraine v. Cartwright, 15 Fed. Cases 870; George v. Emery, 107 Pac. Rep. 3.

### STATEMENT OF THE CASE.

This suit was brought by appellees against appellant to recover damages. The appellees alleging that appellant as their factor had in its possession a large amount of wool, which appellees had instructed appellant to hold for 18 cents per pound, but that appellant had failed to obey said instruction and had sold said wool at a less price to appellee's damage. Appellant denied relation of factor. Case was tried to a jury. Verdict directed in favor of appellees.

### OPINION OF THE COURT.

MECHEM, J.—1. As to appellant's first proposition that there was no evidence to support certain allegations of the complaint, we can say that after a careful reading

of the evidence contained in the record, and the pleadings, that there was ample evidence to sustain the allegations of the complaint. True, there were, as pointed out by appellant, variances as to the time appellees gave appellant instructions as to the price at which the wool was to be sold, but such an allegation need not be proven with precision. U. S. v. Le Baron, 4 Wall. 648; Grayson v. Lynch, 163 U. S. 476, 477.

2. The position of appellees below was that appellant was their factor and such was the view of the trial court.

The appellant, however, insists that it was only an agent in the transaction and that no other conclusion can be drawn from the evidence.

This question does not seem attended with as much difficulty as appellant endeavors to surround it.

The Supreme Court of the United States, in Stark v. Tucker, 23 Wall. 330, thus distinguishes between a factor and a broker:

"The difference between a factor or commission merchant and a broker, is stated by all the books to be this: A factor may buy and sell in his own name, and he has the goods in his possession; while a broker, as such, cannot ordinarily buy or sell in his own name, and has no possesion of the goods sold."

In Words and Phrases, vol. 3, page 2640, the term "factor" is defined as follows:

"A factor is generally defined to be an agent to sell goods or merchandise consigned or delivered to him by or for his principal for a compensation, commonly called 'factorage' or 'commission' citing numerous cases."

The evidence discloses the following facts:

Appellees being desirous of getting a better price for their wool, during the month of September, 1907, opened negotiations with appellant through its Mr. Arnot, manager of its Albuquerque house, with a view of obtaining an advance. Mr. Arnot after a short time informed one of the appellees that Coates Bros. of Philadelphia, Pa., would make an advance of five cents per pound. This being satisfactory to appellees, Mr. Arnot telephoned Mr. McTavish of Becker-Blackwell Co., of Magdalena, where

appellees had their wool stored, to ship same to Philadelphia, Pa., consigned to appellant and send bill of lading to Mr. Arnot at Albuquerque. This being done, appellant drew a draft upon Coates Bros. for the amount of five cents per pound, attached same to the bill of lading, which was assigned by appellant to Coates Bros. The draft was duly paid and appellant upon receiving the proceeds deposited the same to the credit of appellee in the First National Bank of Albuquerque.

Owing to the panic the price of wool was off and it was understood by appellant and appellees that the wool was not to be sold at panic prices. Thereafter appellees say that they by letter instructed appellant to hold said wool at eighteen cents, f. o. b. Philadelphia, Mr. Arnot testifying in behalf of appellant would not deny that appellant had received such instruction by letter, but from numerous letters introduced in evidence, written by appellant to appellee and to Coates Bros., it is evident that appellees had instructed appellant to hold the wool for eighteen cents as above stated and that appellant acquiesced in and accepted such instructions so that the same were as binding upon appellant as if made upon the date of the consignment.

The wool was sold May 22, 1908, and sales statement made by Coates Bros. direct to appellant May 22, 1908, and sales statement made by appellant to appellees July 7, 1908.

Two members of the firm of Coates Bros. testified that they never knew appellees, in the transaction, that they received, advanced money on, held and sold the wool as appellants. Coates Bros. were not appellee's factors. They were appellants', and appellants sustained the same relation to appellee. Had the price of wool fallen to where the advance was used up, Coates Bros. would have looked to appellant to make it up and appellant to appellees. So too, as it is the duty of a factor, before selling at a lower figure than he was instructed to hold out for, to call upon his principal to refund the advances and charges. So Coates Bros. would have called upon appellant and appel-

Goesling v. Gross, Kelly & Co.

lees and before ordering Coates Bros. to sell, appellant should have called upon appellees.

3. Appellant by its third assignment of error says the court committed error in not submitting to the jury disputed questions of fact and our attention is called by appellant to three points upon which it claims there was dispute, and we have examined the evidence carefully in relation thereto and find that as to one matter there was no dispute, upon the second the dispute was immaterial and as to the third it was a question of law to be drawn from undisputed facts.

4. The court in rendering judgment in favor of appellees gave them the difference between the amount the wool was sold for and the price appellees directed the appellant to hold it for. Appellant argues that the recovery should have been, if at all, for the difference between what the wool brought and the highest market price up to the time suit was instituted, not to exceed 18 cents.

With this view, we cannot agree. The measure of damages given by the court was correct. The appellants were instructed to hold the wool for eighteen cents per pound, and if appellees could show that within a reasonable time after the sale and before the trial of the cause that the market price of that wool equalled eighteen cents, they were entitled to the difference between what the wool actually brought and the eighteen cents. It was shown that wool of the class of the wool in controversy went to eighteen cents in Philadelphia in December following the sale. Maynard v. Pease, 99 Mass. 355. Also see 28 Am. & Eng. Ency. of Law 719, where it is said:

"In many cases, however, in trover for conversion by reason of the wrongful taking, detention or disposition of chattels, the plaintiff has been allowed to recover, where the value of the chattel fluctuated between the time of such conversion and the time of trial, the highest market value during such time."

In this case, where a limitation was made by contract, it would seem if, before the trial, the article attains the price limited, that recovery can be had up to that figure

or up to any intermediate figure between the price sold for and the limit set.

It may also be suggested that upon the question of the measure of damages, appellant made no intimation at the trial of what it thought the measure should be, nor can we say from the motion for a new trial that the court's attention was directed to what now appellant claims as error.

There being no error the judgment of the lower court is affirmed.

[Nos. 1339 and 1340, September 1, 1910.]

TERRITORY OF NEW MEXICO, ex Rel, FELIX H. LESTER, Appellee, v. A. W. SUDDITH, A. L. HUTCHISON and E. B. CRISTY, Judges, and JAMES HILL and BERNARD CRAWFORD, Clerks of Election in the 2nd Ward of the City of Albuquerque in the Municipal Election Held April 5th, 1910, Appellants.

TERRITORY OF NEW MEXICO, ex rel, FELIX H. LESTER, Appellee, v. N. E. STEVENS, GEO. H. RAMSEY and E. H. DUNBAR, Judges, and HARRY KELLEY and PERCY J. HAWLEY, Clerks of the Election in the 3rd Ward of the City of Albuquerque, in the Municipal Election Held April 5, 1910, Appellants.

SYLLABUS (BY THE COURT.)

1.   Where judges in a municipal election show in making their return under C. L., Secs. 1687, 1689, that a certain number of ballots have been cast which they have failed to count for any candidate, mandamus and not quo warranto, is the proper remedy to enforce compliance with the duty to count and make returns of such ballots, imposed by law.

2.   After ballots have been tendered by the voter and deposited in the ballot box the quasi judicial function to reject ballots given election judges by C. L., Secs. 1665, 1668, becomes

exhausted and thereafter their powers as to such ballots become purely ministerial.

3. Such ministerial duties include the obligations to count the ballots for the candidates whose names appear thereon and to make return thereof to the city clerk.

4. By making a partial return which, while disclosing the receiving of certain ballots, affirmatively shows that these have not been counted for any candidate and by thereupon adjourning sine die, election judges do not become functi officio but are still subject to mandamus requiring them to reassemble and count such omitted ballots.

5. The writ of mandamus will not require the performance of an act beyond the power of the respondent or dependent upon the will of a third person not a party to the suit.

Appeal from the District Court for Bernalillo County before I. A. ABBOTT, Associate Justice. Reversed and remanded.

MANN & VENABLE for Appellants.

Judges of election are not ministerial officers but quasi judicial officers vested with discretion and involving the exercise of judgment in the counting of ballots, while the canvassing boards is ministerial and has only to compute results from the returns as given to them. C. L. 1897, secs. 2443, 2446, 2447, 692; Bull v. Southwick, 2 N. M. 321; Territory v. County Com., 5 N. M. 1; Re Sloan, 5 N. M. 590.

The writ of mandamus does not lie to direct how judicial officers shall exercise their judgment nor to control their discretion. 26 Cyc. 158 and cases cited; Corbert v. Naylor, N. Y., 57 Atl. Rep. 304; State v. Deane, 23 Fla. 121, 1 So. 698, 2 Am. St. 343; People v. Riordan, 49 Hun. 425, 3 N. Y. Sup. 560.

Upon filing the returns by the judges of election they became functus officio. C. L. 1897, secs. 692, 2447; Bull v. Southwick, 2 N. M. 321; Territory v. County Com.,

5 N. M. 1; Re. Sloan, 5 N. M. 590; State v. Russell, 34 Nebraska 116, 51 N. W. 465; 15 L. R. A. 741; 26 Cyc. 274, n. 44 and cases cited.

Mandamus will not be granted unless some substantial right is involved. The People ex rel Alexander H. Bailey v. The Supervisors of Greene, 12 Barbour 217; 26 Cyc. 156 and cases cited.

The affidavits of judges of election will not be heard to impeach their returns. 10 Am. Enc. Law 829; Ward v. Thompson, 48 Iowa 588; John Nichols v. John Foster, 89 Ill. 386; City of Chicago v. Saldman, 225 Ill. 626, 629; 39 Century Digest 1291, sec. 290 and cases cited.

Evidence other than the returns themselves is not competent to show contents of returns until some foundation is laid for such secondary evidence. Patton v. Coates, 41 Ark. 111; 15 Cyc. 419, 420.

Quo warranto is an adequate remedy. 26 Cyc. 139; 32 Cyc. 1420.

Mandamus can create or impose no powers, rights or duties and may be employed to enforce only such duties as already exist. 26 Cyc. 165 and cases cited; Re Sloan, 5 N. M. 590.

Board of election judges were functi officio. C. L. 1897, secs. 1679, 1687, 1689; Rosenthal v. State Board of Canvassers, 19 L. R. A. 157; McCrary on Elections, 3d ed., sec. 322; 10 Am. & Eng. Enc. of Law, 2d ed., 736; State v. Donnewirth, 21 Ohio St. 216; State y. Knight, 6 Houst., Del. 146; People v. The Board of Town Canvassers, 19 N. Y. Supp. 206; Raemer v. The Board of City Canvassers, 90 Mich. 27.

SUMMERS BURKHART for Appellee.

Mandamus is the appropriate and exclusive remedy to compel a public officer to perform a ministerial duty. 26 Cyc. 139.

The duties of judges and clerks of election are purely ministerial. C. L. 1897, secs. 1665, 1668, 1687, 1689, 2443; Mechem's Public Office and Officers, secs. 491, 511, 522, 657, 660; Bull v. Southwick, 2 N. M. 351; In re Sloan, 5

N. M. 590; .15 Cyc. 379, 380 and cases cited; Corbett v. Naylor, 57 Atl. 304.

A substantial right is involved. 31 Cyc. 337, 606 and cases cited; In re Sloan, 5 N. M. 590, 607.

The presumptions in favor of the performance of official duty and of the validity of official acts are rebuttable. 22 Am. & Eng. Enc. of Law, 2d ed., 1275d and cases cited; 11 Am. & Eng. Enc. of Law, 2nd ed., 488, IV, V, and cases cited.

Quo warranto is an extraordinary legal remedy and not a remedy in the ordinary course of law. High's Extraordinary Legal Remedies, 2 ed., secs. 623 *et seq.*

An election board does not become *functus officio* until it has fully performed the duty prescribed by law. 15 Cyc. 383, 385; Cooley Con. Lim. 936; High Extraordinary Legal Remedies, sec. 56; Re Sloan, 5 N. M. 590, 600; State ex rel. Metcalf v. Garesche, 65 Mo. 480.

### STATEMENT OF THE FACTS.

The relator Felix H. Lester was democratic candidate for the office of mayor of the city of Albuquerque at an election held April 5, 1910. He prayed writs of mandamus against the respondents who were judges and clerks of election in the second and third wards of the city of Albuquerque, directing them to reconvene as such election boards and in the second ward count two ballots which he alleged they had failed to count, and in the third ward seven ballots which he alleged they had failed to count. He set up in his information that the respondents had refused to count said ballots; that the returns of the respondents did not correctly state the result of the election; that if said returns had been correctly and properly certified they would have changed the result of the election. In case No. 1339 two of the judges and one of the clerks filed a verified answer admitting all the allegations of the writ except that they did not certainly know for whom one of the ballots not counted was cast. The other clerk did not appear and E. B. Cristy, one of the judges, is the only appellant. He demurred and his demurrer having been overruled answered alleging, first, that the court

had no jurisdiction of the subject matter or of the parties
for the reason that having made and certified the return
of said election and filed same with the city clerk as re-
quired by law and adjourned sine die they became functus
officio. Second, that the relator had an adequate remedy at
law by quo warranto. Third, that said judges and clerks
performed the duties of their office as provided by law.
Fourth, denied that there were two ballots cast for the
democratic candidate for mayor which were not counted
for him, but on the contrary stated that there were two
ballots not counted, one of said ballots being for the dem-
ocratic candidate and one being for the republican candi-
date for mayor. Fifth, that the ballots not counted were
by agreement of said judges and clerks decided by them to
be invalid and not entitled to be counted in said election.
Sixth, he denied all of the other material allegations of
said writ.

In case No. 3940, G. H. Ramsey and E. H. Dunbar,
and Harry Kelley, one of the clerks, filed a verified answer
to the writ admitting all its allegations. N. E. Stevens,
the other judge, filed an affidavit in support of the writ
and afterwards filed a demurrer to the application on the
ground that the court had no jurisdiction and that the
application and alternative writ did not state facts suffi-
cient to state a cause of action. His demurrer being over-
ruled he did not further answer.

J. P. Hawley, the remaining clerk, filed an answer
practically in the same form as appellant's answer in the
other case, adding on information and belief that the rela-
tor's name appeared on no Socialist ticket for mayor but
alleging that seven Socialist ballots were cast and counted
but not credited to any one for the office of mayor because
all the respondents agreed that the said ballots were illegal
for the reason that the ticket had not been filed with the
probate clerk ten days before the election; he then denied
generally every other allegation of the writ. In each case
the relator filed a motion for judgment on the pleadings
based on the ground that the pleadings affirmatively showed
that the respondents had not performed the duties imposed
by law. The court sustained said motions, peremptory

writs were allowed and appeals taken in case No. 1339 by
E. B. Cristy, and in case No. 1340 by N. E. Stevens and
J. P. Hawley.

The remaining facts appear in the opinion.

### OPINION OF THE COURT.

POPE, C. J.—The present case involves the efficacy
of the writ of mandamus to reach the conditions com-
plained of. The utility of this writ was considered by this
court in Delgado v. Chaves, 5 N. M. 646, 648, where, in
an opinion written by Mr. Justice Freeman, the ends which
the writ has accomplished were very lucidly exemplified
and it was remarked that "it would be a vain and useless
exhibition of research to undertake to point out the almost
innumerable instances in which this writ has been suc-
cessfully invoked." As applied to matters of elections this
writ has been found to be of special efficacy. The adequacy
and especially the promptness of the relief afforded by it
has made it a favorite and valuable method of redress for
the omission or violation of legal duty by election officers,
and these qualities have led the courts to deal with the
writ liberally in the interest of honest elections and a fair
count. While so treating the writ, however, in this class
of cases it has not been forgotten that its use is limited
by well settled principles, among others the axiom that the
writ will not be allowed to control a discretion; that while
it will enforce, it will not create a duty, and that it will
not be granted where it is manifestly beyond the power of
the respondent to perform the duties enjoined. Bearing
in mind the uses and the limitations of the writ we are
called upon to determine whether in the present instance
its issuance was justified. To determine this we must
first ascertain what were the duties of the territorial judges
of election. These duties of course flow solely from the
provisions of statute. It is provided (C. L., Sec. 1687)
that "the judges shall close the election at six o'clock in
the afternoon and immediately thereafter shall open the
ballot boxes and publicly count the votes cast for each
candidate, certifying the poll books as provided by law."
By C. L. 1689, such certificate "shall contain the number

of votes cast for each candidate, setting forth the same in writing and in figures, without there being any alteration or change." Sec. 2447 provides: "The returns of all municipal elections shall be made to the clerk or recorder of the corporation, and shall be opened by him on the third day after election. He shall call to his assistance the mayor of the corporation, or if the mayor shall have been a candidate at such election, then any justice of the peace of the county, and shall, in his presence, make out an abstract and ascertain the candidates elected in all respects as required by law for the canvass of the returns of county elections, and shall in like manner make out a certificate as to each candidate so elected, and cause the same to be delivered to him or to be left at his place of abode."

It is clear that under the foregoing it was the duty of the judges, among other things not here material, (a) to count the votes cast for each candidate, and (b) to set forth the number of votes cast for each candidate in writing and in figures in a return to the city clerk.

It appears from the record in this case that the judges counted the votes and reported, as to the ward involved in case 1339, 537 votes cast, and reported as to the ward involved in case 1340, that seven socialist tickets had been cast. It affirmatively appeared from the return in the first case, however, that while 537 votes were cast, only 535 were included in the vote declared for the two candidates and that in the second the seven socialist tickets were not counted at all. The relator, Lester, alleging that these nine ballots if counted would have been favorable to him to an extent such as to insure his election, prayed that the judges be required to extend upon their returns the names of the persons for whom these uncounted votes had been cast. Since the law as we have seen requires the judges not only to count the votes but to declare upon their return the number of votes for each party, and since upon their own attempted return it is evident that while the judges have counted, they have, to the extent of nine ballots, not declared, the primary impression upon the average mind would be that they had to that extent omitted to perform their legal duty. This being true, and since the

Territory ex rel v. Suddith et al.

very essence of the writ of mandamus is to require the performance of such a duty, it would seem, as a matter of impression that this was a proper case for the allowance of such a writ and that the court below acted properly in ordering the judges of election to declare for whom these nine votes were cast.

Having thus stated the matter as one of impression it remains to be determined whether or not upon a full consideration of the several objections here urged to the writ of mandamus as the proper remedy for the vindication of such an apparent right, the proceedings below may still be sustained. The objections presented by appellant to the decision appealed from are not without force and have been given the consideration which their importance demands. It is urged at the outset that the mandamus will not 'lie because there is a plain adequate and complete remedy in the writ of *quo warranto*. The doctrine on this special subject is thus stated in Spelling on Injunctions and other Ex. Rem., Sec. 1375.

"In order that the existence of another remedy shall constitute a bar to relief by mandamus, such other remedy must not only be an adequate remedy in the general sense of the term, but it must be specific and appropriate to the circumstances of the particular case. It must be such a remedy as is calculated to afford relief upon the very subject of the controversy. For if it is not adequate to afford the party aggrieved the particular right which the law accords him, mandamus will lie, notwithstanding the existence of such other remedy."

It is difficult to see how the remedy of *quo warranto*— even ignoring the fact that it is in this Territory a writ not of right but issuable only by consent of the attorney general—could afford an adequate substitute for the writ here sought. The specific remedy here sought was to secure a declaration upon the face of the returns as to the contents of certain ballots in order that the election of relator might prima facie appear and he be thus awarded a certificate of election. *Quo warranto* would manifestly not be adequate to the vindication of such a right and therefore would not preclude mandamus.

It is next urged that the court below should not have ordered the respondent to declare the ballot for the reason that it was within the discretion of the judges of election to reject votes; and that in holding, as shown by the record that the two ballots in case 1339 should not be counted because upon forms for the wrong ward and in further holding that the seven ballots in the other case should not be counted because upon Socialist tickets and illegal in not having been filed with the probate clerk of the county for ten days, the judges were exercising simply the discretion allowed them by law. We fail; however, to perceive any force in this position. Our territorial statutes give election judges no discretion in the matter of counting or declaring ballots once received. There is a discretion, it is true, at the moment a ballot is tendered. Comp. Laws, Secs. 1665, 1668 and 2443, expressly declares the right of judges of election to reject ballots when tendered. Thus Sec. 1665 is as follows: "When any person offers to vote, whose qualifications, as required by this law, are not personally known to any of the judges, he may be examined under oath as to said qualifications and those who take a false oath shall suffer the penalty prescribed by law for perjury."

Sec. 2443 contains the following proviso to the municipal laws: "Provided, That nothing in this act shall be so construed as to prevent any or all persons so registered from being challenged at the polls as to their right to vote, or to prevent the judges of election from rejecting the vote of any person so registered, for cause, at the polls."

But even in these cases it is provided by section 1668 that a record must be made showing the persons for whom the vote is tendered. That section reads as follows: "When any person offers to vote and is rejected, his name shall be registered in the poll book, and all the names of the persons he offers to vote for, and the word, rejected, shall be written opposite the name of the person offering to vote."

Territory ex rel v. Suddith et al.

But this discretion exists only when the ballot is tendered. Once received, the duty of the judges becomes ministerial and threefold, to count, to declare by return and deliver the ballots to the city clerk. Whether a vote once received is in proper form and may legally be counted is a matter for a tribunal other than the election judges. We think, therefore, that there was no question of judicial discretion involved.

It is insisted, however, that the writ will not lie because the defendant board, having in part counted the votes and having made a return and having adjourned *sine die,* is no longer a board, that it has thereby become *functus officio,* and it may not be reassembled and required to perform further duties; or, as said in one of the cases cited by appellant, the court "cannot animate its dead body with the breath of life."

The defect in this last argument lies in a failure to recognize that official boards, differing from natural persons, cannot commit suicide. Election judges created for a specific purpose and to perform certain public duties have no definite tenure of office. Their life is until their duty is performed or until the performance of that duty is rendered impossible by intervening events. But until such duty is performed or such events intervene the board's existence continues and this, even though through inadvertence or purpose it may have adjourned *sine die.* The performance of a public duty by such a board cannot be avoided or the public interests defeated by a voluntary attempt to terminate its own life. Even where the board says its work is over the law keeps it in existence to complete that work if unfinished. For example, had the board in the present case adjourned *sine die* without counting the votes at all, would it have been *functus officio* so that it could not be reassembled for that purpose? Or had it counted the votes but adjourned without day, before making any return to the city clerk, would the whole election be defeated upon the plea that the board has become dead and therefore cannot be called together to make the return? These observations show that the power to reassemble the board depends not upon whether it has declared

itself adjourned but upon whether it has completed its statutory duty. If the latter has been accomplished the board dies by force of that very fact, whether it has declared itself adjourned or not; if on the other hand it has not been accomplished no resolution to adjourn *sine die* can render the board *functus officio*. If therefore the continuance of the board's existence depends upon whether it has completed its work, upon what principle can it be held that that existence has expired when the board (as shown by its own return) still has unperformed the statutory duty to declare the contents of ballots sufficient in number to turn the election?

The conclusion is, we believe, inevitable that so long as the board has a specific statutory duty imposed upon it still unperformed it continues to exist and is subject to the call of the law for a completion of that duty. An illustration will be found in certain duties imposed upon this court. It has been the practice of congress in creating additional associate justices from time to time to make it the duty of this court to redistrict the Territory, for judicial purposes and to assign the judges to the several districts. Such duty when performed has been considered as exhausting the power of the court as conferred by the several acts. But suppose the court failed, in meeting for this purpose, to assign one of the judges or omitted to include certain counties in any district and then adjourned? Would it be contended that it could not reassemble and fully perform its duty? We think not. Neither do we deem the adjournment of the respondent boards as controlling but they are subject to the mandate of the court to reassemble and complete their legal duties. True, this court in the illustration just given, is a permanent body whereas a board of election judges is temporary—and this circumstance is mentioned in some of the authorities as controlling the right to reassemble, as for instance where one or more of the election board are county officials. We fail, however, to recognize the distinction. A temporary function imposed upon a board otherwise permanent does not make it otherwise than temporary as to that function. These views constitute a sufficient answer to several of the further arguments for

appellant. It is said that by adjournment these judges have become mere individuals and not subject to a writ. But if as we have seen their board is yet existent they are still officials subject to mandate. It is also said that the mandamus will not lie to create a duty but simply to enforce performance of it, and arguing that these judges were under no obligation after making their return to amplify it, it is contended that the writ of mandamus might not be invoked to require them to do what they were not obliged to do without it. But if, as we have seen, there was a clear omission remaining to be remedied and if as we have seen, the judges still remain officers for that purpose, it follows that there was an obligation upon them to remedy the return, if still in their possession, independent of any order to that effect. Indeed, in People v. Nordheim, 99 Ill. 553, it was held that the city clerk who had possession of such returns would be required by mandamus to permit such judges to amend them, so as to comply fully with the law. By this last we do not desire to be considered as holding that election judges should, after making their returns, be permitted at their discretion to withdraw them and make new returns. We can see that in the case of a close election such a course might lead to grave abuses. It will be sufficient to pass upon cases differing from the present one as they reach us and it will be assumed that right minded officials will as in the present case require an order of court before permitting a change in returns already made. But the case now before us is one in which no such danger lurks. The return itself shows that the contents of certain ballots have not been extended and the request is simply that this omission shall be remedied by a supplemental return. To do this will import no new ballots into the return. It will simply, as the statute requires, declare the contents of those already there and thus give relator, if his contention of fact be correct, the prima facie showing of election necessary to a certificate to that effect. This we think he was, so far as the present objection is concerned, entitled to.

This position we consider sustained not only by principle but by precedent. The general doctrine is declared in

15 Cyc. 383, 384 as follows: "But on the other hand it has been repeatedly decided and seems to be the better doctrine that after canvassers have made one canvass, declared the result, and adjourned, they may be compelled by mandamus to reassemble and make a correct canvass of all the returns, where it appears that upon the first canvass they neglected or refused fully to perform their duty. It is settled by abundant authority that where the board refused to canvass any of the votes it may be compelled so to do by mandamus, even though it has adjourned *sine die,* and there can be no difference in principle between a refusal to canvass any and a refusal to canvass a part only of the returns."

The text is sustained by numerous citations. Fair samples of the expressions in these supporting authorities are found in State ex rel. Rice v. The County Judge, 7 Ia. 200, where it is said: "The next subject of examination is the answer that the duty had already been performed. Inasmuch as the canvassers have rejected the returns from three of the townships, which they should have counted, it is legally true that the duty has not been discharged; and when the writ now commands it is not, in a proper legal sense, to recanvass, but to canvass the returns of that election. It is to do that which was before their duty, but which they omitted. What has been done is as if it had not been done, and the judge is now commanded to proceed as if no former steps had been taken."

And in Lewis v. Marshall County Com'rs., 16 Kan. 102, 22 A. R. 275, where speaking through Mr. Justice Brewer, the court says: "It is the duty of the canvassers to canvass all the returns and they as truly fail to discharge this duty by canvassing only a part and refusing to canvass the others as by refusing to canvass any."

While it is true that upon examination some of the authorities cited in support of the text in 15 Cyc. 384 *supra,* are found to be qualified and in some instances are influenced by local statute, we find that many of them give ample support for the position here assumed. It does not seem necessary to consider or quote these in detail. We do not feel inclined in deference to what we deem ill advised

precedents, which may be found to the contrary, to abdicate for the courts a power so conducive to the purity of elections. Where as here that power is sustained by ancient and eminent authority, followed by numerous modern courts, judicial retreat is no less to be deprecated than on the other hand would be judicial encroachment.

While upon all the foregoing grounds the writ below was properly granted the remaining assignment of error impresses us as more serious. It proceeds upon the contention that the writ should not have been granted because it is manifestly beyond the power of the respondent to obey it. The information upon which the writ issued shows that the ballots with the imperfect return complained over "were deposited in the ballot box with the ballots cast at said election in said ward and the said box locked and sealed up and returned to the clerk of the city of Albuquerque and that the said judges have had no opportunity to inspect or correct the same for that reason." It is said by appellants that this averment admits the relator out of court since it discloses the returns, which it is sought to correct, to be in the hands of a third party not a party to the suit. It is argued that there is no assurance that the writ if granted can be obeyed and that courts will not grant the writ in doubtful cases where a compliance with it depends upon the caprices of a third person not before the court. This argument impresses us as sound and its conclusion unavoidable. It is fundamental that to authorize the writ it must appear that if granted it will be effectual as a remedy and that it is within the power of the defendant, as well as his duty, to do the act in question. 2 Spelling on Injunction and other Extraordinary Remedies, Secs. 1369, 1377.

Such power does not appear from this record, but the very contrary. If as relator alleges the records were, when the information was filed, so far beyond the power of the respondents that "they have had no opportunity to inspect or correct the same," how will the granting of the writ give them that opportunity? Mandamus does not confer power nor create opportunity. It enforces the exercise of an existing power, the improvement of opportunity already present.

This view of the matter constrains us to the view that the writ was improvidently granted, at least insofar as it directs returns not within the power of respondents to be amplified by them. The cause must accordingly be remanded. Whether by amendment in this suit or by further proceedings otherwise the defect now held to exist can be remedied so as to bring the returns back into the power of the respondent in order that a writ may operate upon them we need not here determine or intimate. In order, however, that the trial court may be free to deal with the matter unhampered by explicit directions in the mandate we reverse and remand the cause for further proceedings not inconsistent with this opinion, and it is so ordered.

Associate Justices McFie and Wright concur.

Associate Justices Parker and Mechem concur in the reversal. Associate Justice Abbott having tried the case did not participate.

[No. 1350, September 1, 1910.]

S. T. GRAY, et al, Appellants, v. ROBERT H. TAYLOR, et als, Appellees.

### SYLLABUS.

1. There is no legislative requirement that any bill shall receive the signature of the respective presiding officers of the two houses. The journals of the two houses may be judicially noticed in aid of the act.

2. In the absence of any evidence to the contrary it is assumed that the executive acted lawfully and his message stating that he had allowed the act to become law by limitation will be assumed to imply the receipt by him of the act more than three days prior to the message.

3. Petition for election on proposition to remove county seat held sufficient.

4. By the terms of the statute, (Laws 1909, Chapter 80), it is impossible to have registration within the time following the petition and the election.

Gray, et al, v. Taylor et al.

5.  Held that only one illegal vote was cast and that was in favor of Lincoln.

6.  Subsequent repairs to public buildings at county seat should not be counted in determining whether cost of buildings was less than $30,000.

7.  Laws 1909, Chapter 80, not special or local by reason of the twenty mile limitation.

8.  Held that ballot used at election for removal of county seat, which read "For County Seat.................." was in exact accordance with C. L. 1897, sec. 631.

9.  Whether this is a collateral attack upon the location of the county seat, quaere.

Appeal from the District Court for Lincoln County before Merritt C. Mechem, Associate Justice. Affirmed.

T. B. Catron and George B. Barber for Appellants.

Laws 1909, Chapter 80, is local and special legislation in violation of Springer Act. People v. Supervisors, 43 N. Y. 16; Matter v. Henneberger, 155 N. Y. 424, 427; People v. O'Brien, 38 N. Y. 193; Ferguson v. Ross, 126 N. Y. 464; Com. v. Patten, 88 Pa. St. 260; Davis v. Clark, 106 Pa. St. 260; McCarthy v. Com. 110 Pa. St. 246, et seq.; Montgomery v. Co., 91 Pa. St. 125; Devine v. Commissioners, 84 Ill. 591, et seq.; State v. Herman, 75 Mo. 346; Scowdens App. 96 Pa. St. 424-5; Klokke v. Dodge, 103 Ill. 125; State v. Mitchell, 21 Ohio St. 592; State v. Judges, 21 Ohio St. 11; Strange v. Dubuque, 62 Iowa 205; Suth. on Stat. Const., secs. 127, 128, 129, and cases cited; Smith's Com., secs. 595, 596; Sedg. Const. Law 32; 1 Potters Dwarris on Stats. 354, 355; Ex-Parte Westerfield, 55 Calif. 552; Desmond v. Dunn, 55 Calif. 251; Zeigler v. Gadis, 44 N. J. L. 363; Hammer v. State, 44 N. J. L. 669; Bouvier Law Dictionary "local"; 1 Kent Comm. 415; 3 Bouvier's Institutes 95; Jacobs Law Dict. "statute"; 2 Dwarris on Stat. 463; Van Giessen v. Bloomfield, 47 N. J. L. 442; Closson

v. Trenton, 48 N. J. L. 440; Wheeler v. Philadelphia, 27 P. F. S. 338; Kilgore v. MaGee, 4 Nor. 401.

Laws 1909, chapter 80, never was legally enacted. U. S. R. S., sec. 1842; Field v. Clark, 143 U. S. 671; Pang-horn v. Young, 32 N. J. L. 30; Cooley on Con. Lim., 7 ed. 124; U. S. Constitution, article 1, sec. 7; 3 Wigmore, sec. 1684; 23 A. & E. Enc. of Law, 1 ed. 192.

Ballot was misleading and deceiving. C. L. 1897, sec. 631, par. 2; C. L. 1897, secs. 1701, 1706, 1801; Laws 1903, chap. 64, sec. 1; Tally v. Grider, 66 Ala. 122; Lanier v. Padgett, 18 Florida, 843, 844; McKinney v. Commission-ers, 26 Fla. 264, et seq.; Zeiler v. Chapman, 54 Mo. 305-6; State v. Woodson, 67 Mo. 336; State v. Albin, 44 Mo. 349; Pitkin v. McNair, 56 Barb. 77-8; People v. Kopple-kom, 16 Mich. 342; Nefzger v. Railway, 36 Ia. 644; State v. Piper, 17 Neb. 618, 619.

The election was void because there was no registration of voters. Laws 1909, ch. 80, C. L. 1897, secs. 1709, 1710; McCrary on Elections, secs. 135, 193; State v. Scarburox, 110 N. C. P. 232; Smith v. Board of Co. Comms., 45 Fed. 725.

The legislature of the Territory cannot confer judicial power to determine the validity of an election upon the board of county commissioners. U. S. R. S. 1874; Hunike v. Dold, 7 N. M. 11, 12; Garcia y Barela v. Barela, 6 N. M. 245; Payne v. Hook, 7 Wall. 430; Barry v. Hull, 6 N. M. 643.

It is upon defendants to show that expenditures for public buildings made by the name of repairs were not such repairs as added or changed the old buildings in a manner to adapt them for use as a court house and offices. Pipeline Co. v. R. R. Co., 67 N. J. L. 278; City of Catletts-burg v. Self, 74 N. W. 1064.

Material allegations not controverted. C. L. 1897, sec. 2665, sub-sec. 67.

HEWITT & HUDSPETH for Appellees.

The legal enactment of Council Bill No. 86 was not called in question by the plaintiff in the court below and

cannot be raised for the first time in an appellate court. Nall v. Wabash & St. L. & P. Ry. Co., 97 Mo. 75; Commissioners of Highways v. Chicago & N. W. Ry. Co., 34 Ill. Appeals 35; Bennett v. Mo. Pac. Ry. Co., 105 Mo. Rep. 642, 645; Transfer Co. v. Canty, 103 Ill. 423; Carlile, 18 Colo. 461.

Question of conflict of laws 1909, ch. 80, with Springer Act was not raised in court below and should not be considered on appeal. Nall v. Wabash, 97 Mo. 75; Com. v. Ry. Co., 34 Ill. Ap. 35; Bunnell v. Ry. Co., 105 Mo. Rep. 642, 645; Transfer Co. v. Canty, 103 Ill. 423; Hunel v. Carlile, 18 Colo. 461.

Laws 1909, ch. 80, is valid. Codlin v. Board of County Commissioners, 9 N. M. 565.

The approval or non-approval by Governor of Laws 1909, ch. 80, not in issue. Nall v. Wabash, etc., 97 Mo. 75; Com. v. Ry. Co., 34 Ill. App. 35; Bennett v. Ry. Co., 105 Mo. Rep. 642, 645; Transfer Co. v. Canty, 103 Ill. 423; Hunel v. Carlile, 18 Colo. 461.

If a later act covers the whole subject of the first and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act. U. S. v. Tynen, 11 Wall. 88, 89; Bartlett v. King, 12 Mass. 545; Commonwealth v. Cooley, 27 Mass., 10 Pick. 37; Tracy v. Tuffy, 134 U. S. 206.

The mere showing that the act as deposited in the secretary's office fails to show compliance with a rule of each house as to authentication in the place of the journals of each house, in the face of the message of the governor, the endorsements of the chief clerks of each branch of the legislature to the effect that the bill was passed by the legislature, is not sufficient to justify the holding that the law is invalid. Cottrell v. State, 9 Nebr. 125; Leavenworth Co. v. Higenbothem, 17 Kans. 74; Taylor v. Wilson, 17 Nebr. 88; McDonald v. State, 80 Wis. 407; In re Ryan, 80 Wis. 414.

The court was without jurisdiction in this case. 1C A. & E. Enc. of Law, 2d ed., 816; Parmenter v. Bourne, 35 Pac. 586; Hipp v. Charlevoix Co., 62 Mich. 456 and cases cited.

### OPINION OF THE COURT.

PARKER, J.—This is an equitable action brought by plaintiffs as tax payers of the County of Lincoln, to restrain and enjoin the erection of a court house and jail at Carrizozo in said county, and to enjoin the paying out and expenditure of $28,000 of money in the treasury of the county, proceeds of bonds issued and sold by the board of county commissioners for the purpose of erecting a court house and jail at Carrizozo in said county. The action of the board of said county was based upon Chapter 80 of the Laws of 1909, which was initiated in the legislature of 1909 by Council Bill No. 86. Trial was had in the court below which resulted in a denial of the injunction and dismissal of the bill. Appellants make various complaints of the action of the court below.

1. Counsel for appellants argues against the validity of the act because it fails to bear the signatures of the presiding officers of the legislative council and house as required by the respective rules of each house, and cites Field v. Clark, 143, U. S. 671. In that case the specific question presented was whether the journals of the two houses of congress, which contradicted the terms of the act by showing that a certain section of the act, not appearing in the act had in fact been passed by both houses, would control the terms of the act, or whether the engrossed bill, signed by the presiding officers of each house and the president, found in the archives of the office of the secretary of state, would control the recitals of the journal. The court held the latter would control. It held that the journals could not contradict the act but did not hold that they might not be read in aid of the act. Counsel also cites Harwood v. Wentworth, 162 U. S. 557, in which case the holding was the same.

But the question in this case is whether the journals may be resorted to in aid of the act in order to show that it in fact passed both houses. There is no legislative requirement that any bill shall receive the signature of the respective presiding officers of the two houses. The only requirement is found in a rule adopted separately by each house. The journals of the two houses show the

passage of the bill and in such case they may be judicially
noticed in aid of the act.    McDonald v. State, 80 Wis. 507;
Gardner v. Collector, 6 Wall. 499; 7 Ency. Ev. 991, n. 18.

Objection to the validity of the act is made on account
of the absence of the signature of the governor and certif-
icate by him of the date when he received the same.    The
statutory requirements in this regard is found in Sec.
1842, U. S. R. S., which provides:

"That 'every bill which has passed the legislative
assembly of any territory shall, before it becomes a law,
be presented to the governor; if he approve he shall sign
it; but if not, he shall return it, with his objections, * * *
If any bill is not returned by the governor within three
days, Sundays excluded, after it had been presented to him,
the same shall be a law in like manner as if he had signed
it, unless the legislative assembly by adjournment *sine die*
prevent its return, in which case it shall not be a law.' "

It appears from the journals that the act was passed
many days before March 18, the last day of the session
and the day upon which the governor sent a message to
the legislature stating that he had allowed the act to become
law by limitation.    We have examined the original en-
grossed bills on file in the office of the secretary of the Ter-
ritory and find that this was the uniform practice of the
governor in regard to acts allowed to become laws by limi-
tation, and on none of them does he show the date of receipt
of the act by him.    In the absence of any evidence to the
contrary we are compelled to assume that the executive
**2**    acted lawfully and his message will be assumed to
imply the receipt by him of the act more than three
days prior to the message.

2.    The contention is made that the petition for the
election was not in accordance with the act and that, con-
sequently, the county commissioners had no power to call
the election.

The act provides:

"Sec. 2.   That Sec. 630 of the Compiled Laws of
the Territory of New Mexico, of 1897, be, and the same
is, hereby amended so as to read as follows:

"Sec. 630.    Whenever the citizens of any county in

this Territory shall present a petition to the Board of County Commissioners signed by qualified electors of said county, equal in number to at least one-half the legal votes cast at the last preceding general election in said county, asking for the removal of the county seat of said county, to some other designated place, which petition shall be duly recorded in the records of said county, and said board shall make an order directing that the proposition to remove the county seat to the place named in the petition, be submitted to a vote of the qualified electors of said county at the next general election, if the same is to occur within one year of the time of presenting said petition, otherwise at a special election to be called for that purpose at any time within two months from the date of presenting said petition: *Provided,* That whenever it is proposed to remove a county seat of any county which has public buildings consisting of a court house and jail, the original construction of which cost said county more than the sum of thirty thousand ($30,000) dollars, such cost to be ascertained from the records of the Board of County Commissioners of said county, then before said board of commissioners shall make such order so submitting such proposition to remove the county seat, to the qualified voters of said county, shall require from the petitioners or the persons interested in the removal of said county seat a deposit of forty thousand dollars ($40,000) in money, which said deposit shall be placed in the treasury of said county, which said sum of money when so placed in said treasury shall be used in the construction of a court house and jail in the event that the proposition for the removal shall receive a majority of the votes cast at such election, but such deposit shall not be required as a condition precedent to submitting such proposition for the removal in counties which have no court house and jails, the cost to the county of which, as ascertained from the records of said county commissioners is less than said sum of thirty thousand dollars ($30,000) as aforesaid; but the same shall be required in all cases when it is proposed to remove a county seat from a point situated on a railroad to another point also so situated. *Provided, further,* That the city, town, vil-

lage or place named in the petition to which it is proposed to remove said county seat shall be at least twenty miles distant from the then county seat of said county and said petitioners or persons interested in the removal of said county seat shall cause to be conveyed to said county by a good and perfect title, in the event of the proposition for the removal shall receive a majority of the votes cast at such election, sufficient suitable land to be accepted, if containing as much as three-fourths of an acre for court house, jail and other buildings for such county, the deed for which shall be filed with and accepted by the Board of County Commissioners before calling said election which deed to be re-delivered to the grantor therein named in case said proposition to remove said county seat fails to receive a majority of the votes cast at such election, and that no proposition to remove a county seat from a city, town, village or place, situated on a railroad, to one not so situated, shall be entertained or voted upon, and that no vote shall be ordered on substantially the same proposition more than once in ten years."

The petition presented to the Board of County Commissioners in this case was as follows:

"County Seat Petition."

"To the Honorable Board of County Commissioners, of Lincoln County, Territory of New Mexico:

We, the undersigned, qualified electors of the County of Lincoln, in the Territory of New Mexico, respectfully petition you to call an election and submit to a vote of the qualified electors of said Lincoln County, the proposition to remove the county seat of said Lincoln County to Carrizozo, a town situated on the El Paso and Southwestern railroad."

Counsel urges that this petition does not meet the requirements of the statute. He says that this was not a petition to remove the county seat to Carrizozo, but we are unable to agree with the conclusion urged. The proposition was not to submit the question of locating the county seat generally, thus calling for signatures of persons who were opposed to, as well as in favor of the removal. It presents the specific proposition *to remove*

the county seat to Carrizozo. Thus no signer to the petition, and they were largely in excess of the required number, could have been deceived by the petition. Counsel cites Lanier v. Padgett, 18 Fla. 842, and McKinney v. Meyers, 26 Fla. 267. In the first case the statute provided for a petition praying for a change. The petition in that case was "for the purpose of legally locating the court house." The court held properly that the petition was fatally defective because signers might easily have been secured to such a petition who really favored the retention of the county seat at its then location. In the second case the facts were similar and the same decision reached. In this latter case, however, the court uses the significant expression: "If there was in the petition any prayer, or expression of desire, *for a change of location* of the county site, the bill does not inform us of it." In the case at bar the desire to remove the county seat by the signers is apparent.

We therefore hold that the petition was sufficient.

3. Objection is made to the election held at which a large majority of the people of the county determined that the county seat should be located at Carrizozo, on the ground that there was no registration of the voters. By the terms of the statute it is impossible to have registration within the time following the petition and the election. This alone disposes of this contention.

4. The next contention is that there were frauds in the election, but as found by the court below, there was only one illegal vote cast and that was in favor of Lincoln.

5. The act requires that when public buildings at the old county seat cost by way of original construction $30,000, the petitioners for the new county seat must deposit $40,000 in money for the erection of the new county buildings. The court below found that the original cost of the old buildings was less than $30,000 and, as we think, correctly held that subsequent repairs should not be counted.

6. Counsel urges that the law in question is local and special and that no town within twenty miles of a

county seat can ever be a county seat no matter what its qualifications may be. Without reviewing the cases cited it is sufficient to say that this case was considered in Codlin v. Kohlhousen, 9 N. M. 565, and the act was held not to be special or local by reason of the twenty mile limitation. We see no reason to depart from the holding in that case.

Thomas v. Gavin, page 660, should be Thomas v. Cavin.